## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA—NORFOLK DIVISION

TIMOTHY B. BOSTIC,

TONY C. LONDON,

CAROL SCHALL, and

MARY TOWNLEY,

       Plaintiffs,

v.                             CASE NO. 2:13-cv-395

JANET M. RAINEY, in her official
capacity as State Registrar of Vital Records, and

GEORGE E. SCHAEFER, III, in his official
capacity as the Clerk of Court
for Norfolk Circuit Court,

Defendants.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 2

ARGUMENT ..................................................................................................................... 10

I.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE
    VIRGINIA'S MARRIAGE PROHIBITION IS UNCONSTITUTIONAL. ........................... 10

    A.  By Denying Gay Men And Lesbians The Right To Marry, Virginia's
        Marriage Prohibition Violates Due Process. ...................................................... 11

    B.  By Denying Gay Men And Lesbians The Right To Marry, Virginia's
        Marriage Prohibition Violates Equal Protection. ............................................... 15

        1.  Heightened Scrutiny Applies Because Virginia's Marriage Prohibition
            Discriminates On The Basis Of Sexual Orientation. ............................... 15

        2.  Heightened Scrutiny Applies Because Virginia's Marriage Prohibition
            Discriminates On The Basis Of Sex. ...................................................... 21

        3.  Virginia's Marriage Prohibition Cannot Survive Rational Basis
            Review, Let Alone Heightened Scrutiny. ............................................... 22

    C.  *Baker v. Nelson* Does Not Control The Outcome Of This Case. ...................... 30

II. AT A MINIMUM, THIS COURT SHOULD PRELIMINARILY ENJOIN
    APPLICATION OF VIRGINIA'S MARRIAGE PROHIBITION TO THE
    PLAINTIFFS. ........................................................................................................ 32

    A.  Plaintiffs Are Likely To Succeed On Their Constitutional Claims. ................... 32

    B.  Plaintiffs Are Likely To Suffer Irreparable Harm In The Absence Of A
        Preliminary Injunction. ................................................................................... 33

    C.  A Balance Of The Equities Favors Plaintiffs. ................................................... 34

    D.  An Injunction Is In The Public Interest. ........................................................... 35

CONCLUSION .................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena,*
   515 U.S. 200 (1995)..................................................................................................... 16

*Alizai v. MVM, Inc.,*
   40 F. Supp. 2d 752 (E.D. Va. 1998) .......................................................................... 11

*Baker v. Nelson,*
   409 U.S. 810 (1972)................................................................................................ 30, 31

*Barghout v. Bureau of Kosher Meat and Food Control,*
   66 F.3d 1337 (4th Cir. 1994) ...................................................................................... 11

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
   531 U.S. 356 (2001)..................................................................................................... 24

*Bowen v. Gilliard,*
   483 U.S. 587 (1987)..................................................................................................... 16

*Carey v. Population Servs. Int'l, Inc.,*
   431 U.S. 678 (1977)..................................................................................................... 15

*Centro Tepeyac v. Montgomery Cnty.,*
   No. 11-1314, 2013 WL 3336825 (4th Cir. July 3, 2013) ........................................ 35

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
   473 U.S. 432 (1985)..........................................................................................16, 19, 23

*Cleveland Bd. of Educ. v. LaFleur,*
   414 U.S. 632 (1974).................................................................................................. 1, 34

*Craig v. Boren,*
   429 U.S. 190 (1976)..................................................................................................... 31

*Darr v. Massinga,*
   699 F. Supp. 508 (D. Md. 1988).................................................................................. 33

*Dewhurst v. Century Aluminum Co.,*
   649 F.3d 287 (4th Cir. 2011) ...................................................................................... 32

*Elrod v. Burns,*
   427 U.S. 347 (1976)..................................................................................................... 33

*Fatin v. INS,*
   12 F.3d 1233 (3d Cir. 1993) ........................................................................................ 20

*Faust v. S.C. State Highway Dep't,*
   721 F.2d 934 (4th Cir. 1983) ...................................................................................... 17

*Fla. Star v. B.J.F.,*
   491 U.S. 524 (1989)..................................................................................................... 24

**TABLE OF AUTHORITIES**

*(continued)*

<u>Page(s)</u>

*Frontiero v. Richardson,*
  411 U.S. 677 (1973)................................................................................ 21, 31

*Goldberg v. Kelly,*
  397 U.S. 254 (1970)....................................................................................... 35

*Griffin v. Illinois,*
  351 U.S. 12 (1956) ........................................................................................ 16

*Griswold v. Connecticut,*
  381 U.S. 479 (1965).................................................................................. 11, 23

*Harper v. Va. Bd. of Elections,*
  383 U.S. 663 (1966) ...................................................................................... 16

*Heller v. Doe,*
  509 U.S. 312 (1993)................................................................................... 22, 25

*Henry v. Greenville Airport Comm'n,*
  284 F.2d 631 (4th Cir. 1960) ........................................................................ 33

*Hernandez-Montiel v. INS,*
  225 F.3d 1084 (9th Cir. 2000) ...................................................................... 20

*Hicks v. Miranda,*
  422 U.S. 332 (1975)....................................................................................... 31

*Hollingsworth v. Perry,*
  133 S. Ct. 2652 (2013).......................................................................... 20, 26, 35

*Johnson v. Bergland,*
  586 F.2d 993 (4th Cir. 1978) ........................................................................ 33

*Kerrigan v. Comm'r of Pub. Health,*
  957 A.2d 407 (Conn. 2008) ........................................................................... 18

*Kramer v. Union Free Sch. Dist. No. 15,*
  395 U.S. 621 (1969)....................................................................................... 16

*Lawrence v. Texas,*
  539 U.S. 558 (2003).................................................................................. *passim*

*Loving v. Virginia,*
  388 U.S. 1 (1967)..................................................................................... *passim*

*Lyng v. Castillo,*
  477 U.S. 635 (1986)....................................................................................... 16

*M.L.B. v. S.L.J.,*
  519 U.S. 102 (1996).................................................................................... 1, 11

*MacDonald v. Moose,*
  710 F.3d 154 (4th Cir. 2013) ........................................................................ 17

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Mandel v. Bradley,*
    432 U.S. 173 (1977)............................................................................ 30

*Mass. Bd. of Ret. v. Murgia,*
    427 U.S. 307 (1976)....................................................................... 16, 19

*Massachusetts v. U.S. Dep't of Health & Human Servs. ("Gill"),*
    682 F.3d 1 (1st Cir. 2012)............................................................. *passim*

*Meyer v. State of Nebraska,*
    262 U.S. 390 (1923)............................................................................ 27

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.,*
    354 F.3d 249 (4th Cir. 2003) ............................................................. 35

*Palmore v. Sidoti,*
    466 U.S. 429 (1984)............................................................................ 28

*Plessy v. Ferguson,*
    163 U.S. 537 (1896)............................................................................ 1

*Plyler v. Doe,*
    457 U.S. 202 (1982)............................................................................ 15

*Republican Party of Minn. v. White,*
    536 U.S. 765 (2002)............................................................................ 24

*Romer v. Evans,*
    517 U.S. 620 (1996)..................................................................... *passim*

*The News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth.,*
    597 F.3d 570 (4th Cir. 2010) ............................................................. 11

*Thomasson v. Perry,*
    80 F.3d 915 (4th Cir. 1996) ............................................................... 17

*Turner v. Safley,*
    482 U.S. 78 (1987)............................................................ 12, 23, 27, 31

*United States v. Virginia,*
    518 U.S. 515 (1996)....................................................................... 16, 22

*United States v. Windsor,*
    133 S. Ct. 2675 (2013)................................................................ *passim*

*Vance v. Bradley,*
    440 U.S. 93 (1979)............................................................................. 22

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) ................................................... 16, 17, 18

*Washington Post v. Robinson,*
    935 F.2d 282 (D.C. Cir. 1991)........................................................... 11

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Waters v. Gaston Cnty.*,
    57 F.3d 422 (4th Cir. 1995) ............................................... 14

*Williams v. Illinois*,
    399 U.S. 235 (1970)........................................................... 25

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012) ......................................... 17, 20

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................... 32

*Zablocki v. Redhail*,
    434 U.S. 374 (1978)..................................................... *passim*

**Statutes**

29 U.S.C. § 2612.......................................................................... 9

42 U.S.C. § 1983.......................................................................... 6

Affirmation of Marriage Act, House Bill No. 751 (2004)............... 3, 23, 29

Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996)............... *passim*

Va. Code § 107.3........................................................................... 9

Va. Code § 1202........................................................................... 8

Va. Code § 18.2-57(B).............................................................. 5, 19

Va. Code § 2.2-3901............................................................. 5, 18, 21

Va. Code § 20-13........................................................................... 5

Va. Code § 20-14........................................................................... 5

Va. Code § 20-33........................................................................... 5

Va. Code § 20-38.1...................................................................... 7, 8

Va. Code § 20-45.2........................................................... 2, 8, 11, 29

Va. Code § 20-45.3............................................................... 2, 3, 29

Va. Code § 20-61......................................................................... 10

Va. Code § 20-91........................................................................... 9

Va. Code § 32.1-252...................................................................... 6

Va. Code § 32.1-261.................................................................... 6, 8

Va. Code § 32.1-262...................................................................... 6

Va. Code § 32.1-267...................................................................... 6

Va. Code § 32.1-268.1................................................................... 6

Va. Code § 36-96.3.............................................................. 5, 18, 21

**TABLE OF AUTHORITIES**
*(continued)*

<u>**Page(s)**</u>

Va. Code § 45.1 ................................................................................................ 7, 8

Va. Code § 45.2 ................................................................................................... 9

Va. Code § 45.3 ................................................................................................. 11

Va. Code § 54.1-2986 .................................................................................... 8, 10

Va. Code § 55-20.2 ........................................................................................... 10

Va. Code § 58.1-322 ........................................................................................... 9

Va. Code § 63.2-1201 ......................................................................................... 8

Va. Code § 63.2-1709.3 ................................................................................ 5, 18

Va. Code § 64.2-302 ......................................................................................... 10

Va. Code § 64.2-305 ......................................................................................... 10

Va. Code § 64.2-309 ........................................................................................... 9

Va. Const. Art. I, § 15-A ...................................................................... 2, 4, 11, 29

Virginia Senate Bill 884 (1997) ......................................................................... 2

**Rules**

Fed. R. Civ. P. 56 ............................................................................................. 11

Fed. R. Evid. 201(b) ......................................................................................... 11

Fed. R. Evid. 201(c)(2) ..................................................................................... 11

**Other Authorities**

Alexis Dinno & Chelsea Whitney, *Same Sex Marriage and the Perceived Assault on Opposite Sex Marriage*, PLoS ONE 8(6) (2013) .................................................... 27

## INTRODUCTION

This case is about "the freedom to marry," which "has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia*, 388 U.S. 1, 12 (1967).   The Supreme Court has reaffirmed fourteen times that marriage is "the most important relation in life," and that the right to marry is of "fundamental importance for all individuals." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978); *see also Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639 (1974).   As a result, "[c]hoices about marriage" are "sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (internal quotation marks omitted).

This case is also about equality—the most essential ingredient of the American dream—and the "dignity and integrity" that come with it. *United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013).   It is beyond dispute that "the Constitution 'neither knows nor tolerates classes among citizens.'" *Romer v. Evans*, 517 U.S. 620, 623 (1996) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)).   Moreover, the Supreme Court repeatedly has held that the Constitution prohibits laws that "impose a disadvantage, a separate status, and so a stigma upon" gay men and lesbians. *Windsor*, 133 S. Ct. at 2693–94; *see also Lawrence v. Texas*, 539 U.S. 558, 574 (2003); *Romer*, 517 U.S. at 635.   The tragic time has long passed when our government could target its gay and lesbian citizens for discriminatory, disfavored treatment—even imprisonment—because those in power deemed gay relationships deviant, immoral, or distasteful. *See Lawrence*, 539 U.S. at 575–76.

Despite these bedrock constitutional principles, Virginia has decided to single out gay men and lesbians and enshrine in Virginia's Constitution and statutory code that they are different, that their loving and committed relationships are ineligible for the designation "marriage," and that they and the children they raise are unworthy of that "most important relation in life."

*See* Va. Cont. Art. I, § 15-A; Va. Code §§ 20-45.2, 45.3 (collectively, "Virginia's Marriage Prohibition"). No less than the provision of the federal Defense of Marriage Act ("DOMA") struck down by the Supreme Court earlier this year, Virginia's Marriage Prohibition "demeans" same-sex couples, "places [them] in an unstable position," "humiliates tens of thousands of children now being raised by same-sex couples," and "instructs all [State] officials, and indeed all persons with whom same-sex couples interact, including their own children, that their [relationship] is less worthy than the [relationships] of others." *Windsor*, 133 S. Ct. at 2694–96. The Fourteenth Amendment does not permit such discriminatory treatment.

Just as the Supreme Court vindicated the foundational principles of freedom and equality that were being trammeled by Virginia's anti-miscegenation laws nearly 50 years ago, *see Loving*, 388 U.S. at 11–12, this Court now should act to halt Virginia's policy, enshrined in its constitution and its laws, of walling off gay men and lesbians from the institution of marriage. Virginia's ban on interracial marriages violated the constitutional commands of due process and equal protection, and Virginia's sweeping ban on marriage for gay men and lesbians violates those constitutional commands no less. The Court should grant summary judgment to Plaintiffs and declare Virginia's Marriage Prohibition facially unconstitutional.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Evolution Of Virginia's Marriage Prohibition

1. Since 1975, Virginia law has limited the institution of civil marriage to a union between a man and a woman. Va. Code. § 20-45.2.

2. In 1997, the Virginia legislature amended Virginia Code Section 20-45.2 to provide that marriages legally obtained by same-sex couples in other States "shall be void in all respects in Virginia" and that "any contractual rights created by such marriage shall be void and unenforceable." Va. Code § 20-45.2; Va. Senate Bill 884, ch. 354 (1997).

3. In 2004, the Virginia legislature adopted the Affirmation of Marriage Act, which amended Virginia law to prohibit not only marriage between individuals of the same sex, but also any

"civil union, partnership contract or other arrangement between persons of the same sex purporting to bestow the privileges or obligations of marriage."  Va. Code § 20-45.3.

4.  The Affirmation of Marriage Act also provides that same-sex civil unions or partnerships legally established in other States are "void in all respects in Virginia" and any contractual rights created by the union "shall be void and unenforceable."  Va. Code § 20-45.3.

5.  The Affirmation of Marriage Act was known as House Bill Number 751 in the Virginia House of Delegates and was sponsored by, among others, Richard Black and Robert Marshall.  Affirmation of Marriage Act, House Bill No. 751 (2004).

6.  House Bill Number 751 stated that "homosexual marriage . . . is directed at weakening the institution of marriage."  *Id.*

7.  House Bill Number 751 also claimed that while "heterosexual marriage requires sexual exclusivity," same-sex couples who marry "merely prefer sexual exclusivity, but do not demand it."  In addition, House Bill 751 declared that "marriage between homosexuals . . . contains an 'understanding of the need for extramarital outlets.'"  *Id.*

8.  House Bill Number 751 stated that marriage should be limited to a male and female, "whether or not they are reproductive in effect or motivation."  *Id.*

9.  House Bill Number 751 also stated that allowing same-sex couples to marry would devalue the status of children because "children need not just parents, but a mother and a father, and to deprive children of a mother and a father is harmful to their development."  *Id.*

10. House Bill Number 751 stated that neither marriage nor civil unions are "needed for the exercise or enjoyment of civil rights by citizens with same sex attractions."  *Id.*

11. House Bill Number 751 included in its "legislative findings" the fact that "in 1996, the United States Congress passed the Defense of Marriage Act (Pub. L. No. 104-199, 110 Stat. 2419 (1996)), which recognized the traditional definition of marriage as between one man and one woman for all aspects of federal law."  *Id.*

12. House Bill Number 751 also included in its "legislative findings" that there are "life-shortening and health compromising consequences of homosexual behavior" that inure "to the detriment of all citizens regardless of their sexual orientation or inclination."  *Id.*

13. In 2004, Richard Black, one of the co-sponsors of House Bill Number 751, publicly stated, "The whole agenda of the homosexual movement is to entice children to submit to sex practices.  Those groups lead children to experiment with potentially fatal sex practices that spread AIDS and other sexually transmitted diseases."  Lustig Decl. Ex. A (The Washington Times, "Gay-Straight" Clubs in Schools Anger Foes, Nov. 17, 2004).

14. In 2004, Robert Marshall, one of the co-sponsors of House Bill Number 751, authored an article in The Washington Post in which he referred to marriage between gay and lesbian indi-

viduals as "counterfeit marriage" and stated that the Affirmation of Marriage Act was "needed to resist the agenda of activist homosexuals" because the "danger" they posed was "real." Lustig Decl. Ex. B (The Washington Post, No "New Jim Crow" in Virginia, July 3, 2004).

15. In 2006, a majority of Virginia's voters ratified a constitutional amendment (the "Marshall/Newman Amendment") that defines marriage as a union between "one man and one woman." Va. Const. Art. I, § 15-A; Rainey Answer ¶ 19.

16. The Marshall/Newman Amendment provides that the Commonwealth and its political subdivisions will not create or recognize any legal status between unmarried people intended to approximate the "design, qualities, significance, or effects of marriage." Va. Const. Art. I, § 15-A.

17. In addition, the Marshall/Newman Amendment provides that the Commonwealth and its political subdivisions will not create or recognize any "union, partnership, or other legal status to which is assigned the rights, benefits, obligations, qualities, or effects of marriage." *Id.*

18. In 2006, then-Attorney General Robert McDonnell issued an official advisory opinion concerning the proposed Marshall/Newman Amendment, which recognized that "[a]mong the legal benefits unique to marriage [under Virginia law] are a spouse's share of a decedent's estate, the right to hold real property as tenants by the entireties, the authority to act as a 'spouse' to make medical decisions in the absence of an advance medical directive, the right as a couple to adopt children," and other enumerated rights and obligations under the Virginia Code. Lustig Decl. Ex. C (Letter from Attorney General R. McDonnell to S. Newman, D. Albo, K. Byron, J. Cosgrove, and R. Marshall, dated Sept. 14, 2006).

19. Campaign materials in support of the Marshall/Newman Amendment included a television commercial that told voters, "[God] created them male and female. For this reason, a man will leave his father and mother and be united with his wife and they will become one flesh, for God's design." Lustig Decl. ¶ 16 (attesting to accuracy of transcription of va4marriage.org commercial).

20. Before the Marshall/Newman Amendment was adopted, Virginia Delegate Kathy J. Byron advocated in its favor stating, "By changing the definition of marriage, the family, too, would be redefined, ultimately destroying the traditional family." Lustig Decl. Ex. D (The Washington Post, Gay Marriage Ban Advances in Va., Jan. 14, 2006).

21. Then-Virginia Senator (now-Attorney General) Kenneth Cuccinelli urged his colleagues to adopt the Marshall/Newman Amendment by claiming "[t]he homosexual left has been on the attack against marriage and family for 40 years," and that the amendment was necessary for "regaining lost ground." Lustig Decl. Ex. E (The Washington Post, Va. Senate Backs Ban on Gay Marriage, Feb. 8, 2005).

22. More recently, Attorney General Cuccinelli publicly stated that homosexuality "brings nothing but self-destruction, not only physically but of their soul." Lustig Decl. Ex. F (The Washington Post, Cuccinelli Basks in Richmond's Warmer Climate, Feb. 5, 2008).

23. Similarly, Attorney General Cuccinelli has stated that homosexual acts are "intrinsically wrong" and "don't comport with natural law"; and that homosexual behavior "is not healthy to an individual and in aggregate is not healthy to society." Lustig Decl. Ex. G (The Virginia Pilot, Steve Shannon for Attorney General, Oct. 26, 2009); Ex. H (Huffington Post, Ken Cuccinelli Loses Petition to Uphold Anti-Sodomy Law, Apr. 10, 2013).

24. In 2010, Virginia Governor Robert McDonnell signed an Executive Order that banned state discrimination in the state workforce on grounds that include race, sex, religion, and age, but he removed sexual orientation. Attorney General Cuccinelli then issued an official opinion instructing colleges and universities in Virginia to eliminate from their non-discrimination policies protections on the basis of "'sexual orientation,' 'gender identity,' 'gender expression,' or like classification." Lustig Decl. Ex. I (Executive Order No. 6 (2010)); Ex. J (Letter from Kenneth T. Cuccinelli, II, to Presidents, Rectors, and Visitors of Virginia's Public Colleges and Universities, dated Mar. 4, 2010).

25. Virginia law permits private adoption agencies to refuse adoptions based on the sexual orientation of the prospective parents. Va. Code § 63.2-1709.3.

26. Neither Virginia's Human Rights Act nor its Fair Housing Law prohibits discrimination on the basis of sexual orientation. Va. Code §§ 2.2-3901, 36-96.3.

27. Virginia's hate crime law does not punish violence against individuals based on their sexual orientation. Va. Code § 18.2-57(B).

28. From 2004, when the Affirmation of Marriage Act was adopted, to today, there have been at least 270 hate crimes in Virginia targeting individuals based on their sexual orientation. Lustig Decl. ¶ 17 (attesting to tabulation of statistics available at www.fbi.gov).

**Defendants' Responsibilities For Enforcing Virginia's Marriage Prohibition**

29. Defendant George E. Schaefer, III, is Clerk of the Circuit Court for the City of Norfolk. First Am. Compl. ¶ 15; Schaefer Answer ¶ 15.

30. Every marriage license in Virginia must "be issued by the clerk or deputy clerk of a circuit court of any county or city." First Am. Compl. ¶ 15; Va. Code § 20-14.

31. Defendant Schaefer, in his official capacity as Clerk, has the duty to issue marriage licenses in Norfolk, Virginia, to residents of his city seeking to marry. First Am. Compl. ¶ 15; Va. Code §§ 20-14, 20-13; Schaefer Answer ¶ 15.

32. Defendant Schaefer, in his official capacity as Clerk, is responsible for determining whether individuals meet the requirements for marriage in Virginia as reflected in the couple's application for a marriage license. First Am. Compl. ¶ 15; Va. Code §§ 20-14, 20-33.

33. If the Circuit Court Clerk knowingly issues a marriage license that is contrary to law, the Clerk can be sentenced to up to one year in jail and fined up to $500. Va. Code § 20-33.

34. Defendant Schaefer is a person under 42 U.S.C. § 1983 and was acting under the color of state law at all relevant times.  First Am. Compl. ¶ 15.

35. Defendant Rainey is the Virginia State Registrar of Vital Records.  First Am. Compl. ¶ 16; Rainey Answer ¶ 16.

36. Defendant Rainey's duties include directing and supervising the system of vital records in the Commonwealth.  First Am. Compl. ¶ 16; Rainey Answer ¶ 16; Va. Code § 32.1-252.

37. Defendant Rainey also serves as the custodian of official records and directs, supervises, and controls the actions of all persons relating to the operation of the state-wide system of maintaining vital records.  First Am. Compl. ¶ 16; Rainey Answer ¶ 16; Va. Code § 32.1-252.

38. Defendant Rainey's responsibilities include providing forms for marriage licenses, marriage certificates, and applications for marriage licenses used in Virginia.  First Am. Compl. ¶ 16; Rainey Answer ¶ 16; Va. Code § 32.1-267.

39. Defendant Rainey's office also compiles, publishes, and makes available to the public aggregate data on the number of marriages that take place in Virginia.  This data includes the age and race of married couples, the number of minor children, if any, and other information. First Am. Compl. ¶ 16; Rainey Answer ¶ 16; Va. Code § 32.1-268.1.

40. Defendant Rainey acts in her official capacity to publish and furnish to local clerks' offices the marriage forms that require applicants to list a "Bride" and a "Groom."  First Am. Compl. ¶ 16; Rainey Answer ¶ 16; Va. Code § 32.1-252.

41. Defendant Rainey also acts in her official capacity to issue new birth certificates upon proof that a child has been adopted or "legitimated" through the marriage of the child's parents. First Am. Compl. ¶ 16; Rainey Answer ¶ 16; Va. Code §§ 32.1-261, 262.

42. Defendant Rainey is a person under 42 U.S.C. § 1983 and was acting under the color of state law at all relevant times.  First Am. Compl. ¶ 16.

### Plaintiffs Bostic And London

43. Plaintiffs Timothy B. Bostic and Tony C. London live in Norfolk, Virginia, where they own their own home.  Bostic Decl. ¶¶ 1, 3; London Decl. ¶¶ 1−2, 3.

44. Plaintiff Bostic is an Assistant Professor of English Education in the Department of English at Old Dominion University in Norfolk, Virginia.  He teaches English Education to undergraduate students.  Bostic Decl. ¶ 2.

45. Plaintiff London is a veteran of the United States Navy.  He has worked as a real estate agent in Virginia for 16 years.  London Decl. ¶ 3.

46. Plaintiffs Bostic and London have been in a long-term, committed relationship with each other since 1989.  They have lived together continuously in Virginia for over 20 years.  Bostic Decl. ¶ 3; London Decl. ¶ 4.

47. Plaintiffs Bostic and London desire to marry each other.  They seek to publicly commit themselves to one another, participate in a State-sanctioned celebration of their relationship, and receive the same rights and responsibilities that Virginia law confers on opposite-sex couples who marry.  Bostic Decl. ¶ 5; London Decl. ¶ 6.

48. Plaintiffs Bostic and London meet all of the legal requirements for marriage in Virginia (including that they are over the age of 18, they are not related, and they reside in the Commonwealth), except that they are a same-sex couple.  Bostic Decl. ¶ 7; London Decl. ¶ 8; Va. Code §§ 20-38.1, 45.1.

49. On July 1, 2013, Plaintiffs Bostic and London applied for a marriage license from the Clerk for the Circuit Court for the City of Norfolk.  They completed the application for a marriage license and affirmed that they are over the age of 18 and unrelated.  Bostic Decl. ¶¶ 6−8; London Decl. ¶¶ 7−9.

50. Plaintiffs Bostic's and London's application for a marriage license was denied by the Clerk of the Circuit Court for the City of Norfolk because they are a same-sex couple.  Bostic Decl. ¶¶ 9−10; London Decl. ¶¶ 9−10.

**Plaintiffs Schall And Townley And Their Daughter E. S.-T.**

51. Plaintiffs Carol Schall and Mary Townley live in Chesterfield County, Virginia, with their 15-year-old daughter, E. S.-T.  Schall Decl. ¶¶ 1−2; Townley Decl. ¶¶ 1−2, 7.

52. Plaintiff Schall is an Assistant Professor in the School of Education at Virginia Commonwealth University ("VCU") in Richmond, Virginia.  She specializes in research on teaching autistic children.  Schall Decl. ¶ 3.

53. Plaintiff Townley is the Supervisor of Transition at Health Diagnostic Laboratory, Inc. ("HDL").  She helps train individuals with significant disabilities so that they can work at HDL.  Townley Decl. ¶ 5.

54. Plaintiffs Townley and Schall have been in a committed relationship since 1985.  Throughout their nearly 30 years as a couple, they have lived continuously in Virginia.  Schall Decl. ¶¶ 5−6; Townley Decl. ¶¶ 2−3.

55. Plaintiff Townley gave birth to the couple's daughter, E. S.-T., in 1998.  Schall Decl. ¶ 8; Townley Decl. ¶ 7.

56. During Plaintiff Townley's pregnancy, she was admitted to the emergency room at VCU's Medical Center due to complications that left her unable to speak.  For several hours during her stay, Plaintiff Schall was denied access to her or to information about her condition be-

cause Plaintiff Schall is not Plaintiff Townley's spouse under Virginia law.  Schall Decl. ¶ 8; Townley Decl. ¶ 9; Va. Code § 54.1-2986.

57. Since E. S.-T. was born, Plaintiff Schall has desired to adopt her.  Because Virginia law does not permit second-parent adoption unless the couple is married, Plaintiff Schall cannot legally do so.  Schall Decl. ¶ 12; Va. Code §§ 63.2-1201, 1202.

58. Plaintiffs Schall and Townley retained an estate planning attorney to petition a court to grant Plaintiff Schall full joint legal and physical custody of E. S.-T., incurring significant expenses in legal fees.  Although the court granted their petition, Plaintiff Schall remains unable to legally adopt E. S.-T.  Schall Decl. ¶¶ 13−14; Townley Decl. ¶¶ 9−10.

59. Despite being unable to legally adopt E. S.-T., Plaintiff Schall acts as a parent to E. S.-T., just as Plaintiff Townley does.  Together, they provide her with love, support, structure, and discipline.  Plaintiffs Schall and Townley each share in E. S.-T.'s triumphs and defeats, and they are guided in their lives by E. S.-T.'s best interests.  They live together in one household as a family.  Schall Decl. ¶¶ 11, 18−19; Townley Decl. ¶ 7.

60. In 2008, Plaintiffs Schall and Townley were legally married in California.  Schall Decl. ¶ 6; Townley Decl. ¶ 6.

61. Plaintiffs Schall and Townley seek to have the Commonwealth recognize their legal marriage.  Schall Decl. ¶¶ 26−30; Townley Decl. ¶ 19.

62. Plaintiffs Schall and Townley meet all of the legal requirements to have their marriage recognized in Virginia (including that they were over the age of 18 at the time of their marriage, they are not related, and they reside in the Commonwealth), except that they are a same-sex couple.  Schall Decl. ¶ 6; Townley Decl. ¶ 6; Va. Code §§ 20-38.1, 45.1.

63. Because the Commonwealth will not recognize their legal California marriage, Plaintiffs Schall and Townley cannot obtain a marriage license or a birth certificate for their daughter listing them both as her parents.  Schall Decl. ¶¶ 7, 15; Townley Decl. ¶ 10; Va. Code §§ 20-45.2, 32.1-261.

64. In April 2012, Plaintiffs Schall and Townley sought to renew E. S.-T.'s passport, a process that typically requires the consent of both parents.  When Plaintiffs Schall and Townley presented E. S.-T.'s renewal forms, the civil servant at the post office told Plaintiff Schall, "You're nobody, you don't matter."  Schall Decl. ¶ 17; Townley Decl. ¶ 12.

65. After E. S.-T. was born, Plaintiff Townley had to return to work in part because her own health insurance was expiring and she could not obtain coverage under Plaintiff Schall's insurance plan.  Schall Decl. ¶ 21; Townley Decl. ¶ 14.

66. Until February 2013, neither Plaintiff Schall nor Plaintiff Townley was able to cover the other on their employer-provided health insurance.  Schall Decl. ¶ 21; Townley Decl. ¶ 14.

67. Since February 2013, Plaintiff Townley has been able to obtain health insurance coverage under her employer-provided plan for Plaintiff Schall but must pay state income taxes on the benefit because she and Plaintiff Schall are not recognized as married by Virginia law. Schall Decl. ¶ 21; Townley Decl. ¶ 14.

68. Plaintiffs Schall and Townley were not eligible for protections under the federal laws governing family medical leave when their daughter was born, and when one of their parents passed away. Schall Decl. ¶ 22; Townley Decl. ¶ 17; 29 U.S.C. § 2612.

69. If the Commonwealth recognized Plaintiffs Schall's and Townley's legal marriage and permitted them to both be listed on their daughter's birth certificate, even without a will, E. S.-T. would inherit the estate of both parents in the event of their death, and may avoid tax penalties on any inheritance from Plaintiff Schall. Schall Decl. ¶¶ 15, 26, 28; Townley Decl. ¶¶ 10, 15−18; Va. Code § 64.2-309.

70. Under Virginia's Marriage Prohibition, agreements between Plaintiff Schall and Townley concerning custody, care, or financial support for E. S.-T. could be declared by a court to be void and unenforceable. Schall Decl. ¶ 29; Townley Decl. ¶ 18; Va. Code § 45.2.

71. Because the Commonwealth does not recognize their legal marriage, neither Plaintiff Schall nor Plaintiff Townley nor E. S.-T. receive the benefit of Virginia's laws that promote keeping families intact, including Virginia's requirement of a one-year separation before a no-fault divorce may be granted. Schall Decl. ¶ 30; Townley Decl. ¶ 15; Va. Code § 20-91.

## Additional Effects Of Virginia's Marriage Prohibition On Plaintiffs

72. Plaintiffs' inability to marry in Virginia or to have their legal marriage recognized by the Commonwealth has caused them severe humiliation, emotional distress, pain, suffering, psychological harm, and stigma. Bostic Decl. ¶ 18; London Decl. ¶ 20; Schall Decl. ¶ 31; Townley Decl. ¶ 20.

73. Because of Virginia's Marriage Prohibition, Plaintiffs have been unable to file tax returns as married individuals. This has caused them to incur tax obligations that they would not have incurred if Virginia law permitted them to marry or recognized their legal marriage. Bostic Decl. ¶ 13; London Decl. ¶ 15; Schall Decl. ¶ 23; Townley Decl. ¶ 15; Va. Code § 58.1-322.

74. Because of Virginia's Marriage Prohibition, Plaintiffs cannot name their partner as their beneficiary on employee benefit plans without paying state taxes on the benefits that would accrue if one of them died. Bostic Decl. ¶ 13; Schall Decl. ¶ 21; Townley Decl. ¶ 14.

75. Because of Virginia's Marriage Prohibition, the property Plaintiffs have acquired during the course of their relationships that would be deemed by Virginia law to belong to both spouses only belongs to one individual. Bostic Decl. ¶ 13; London Decl. ¶ 13; Schall Decl. ¶ 26; Va. Code § 107.3.

76. Because of Virginia's Marriage Prohibition, Plaintiffs are not eligible for favorable insurance rates for automobile, life, and other insurance coverages regulated by Virginia law.  Bostic Decl. ¶ 13; London Decl. ¶ 16; Schall Decl. ¶ 25; Townley Decl. ¶ 17.

77. Because of Virginia's Marriage Prohibition, Plaintiffs are not mutually responsible for supporting their same-sex partner in the event of their separation.  London Decl. ¶ 13; Va. Code § 20-61.

78. Because of Virginia's Marriage Prohibition, without a will, Plaintiffs would not inherit the estate of their same-sex partner in the event of his or her death.  Bostic Decl. ¶ 15; London Decl. ¶ 14; Schall Decl. ¶ 26, 28; Townley Decl. ¶ 16; Va. Code §§ 64.2-302, 305.

79. Because of Virginia's Marriage Prohibition, upon one partner's death, the other partner would not automatically assume full ownership of their jointly purchased home (as tenants by the entirety) without being subject to estate taxes or the probate process.   Bostic Decl. ¶ 16; London Decl. ¶¶ 12, 14; Schall Decl. ¶¶ 26, 28; Townley Decl. ¶ 16; Va. Code § 55-20.2.

80. Because of Virginia's Marriage Prohibition, Plaintiffs could not make a medical decision as their partner's "spouse" without an advance medical directive.  Bostic Decl. ¶ 15; London Decl. ¶ 17; Schall Decl. ¶ 27; Townley Decl. ¶ 8; Va. Code § 54.1-2986.

81. Now that the Supreme Court has invalidated the federal Defense of Marriage Act, Virginia's Marriage Prohibition also causes Plaintiffs to be denied federal benefits to which they would be entitled if their marriages were legal or recognized in Virginia.  Bostic Decl. ¶ 17; London Decl. ¶ 18; Schall Decl. ¶ 22; Townley Decl. ¶ 17.

82. The Plaintiffs feel shame, stigma, and humiliation as a result of Virginia's Marriage Prohibition.  Plaintiffs feel that they have been singled out for discriminatory treatment and that the Commonwealth has deemed them to be second-class citizens.  They feel that the laws reflect the Commonwealth's rejection of their decision or desire to marry one another.  Plaintiffs also feel that the laws classify them, their relationships, and their families as "less than" others, not "good enough" for the Commonwealth's sanction, and undeserving of recognition or protection under Virginia's laws.  Plaintiffs are ashamed and embarrassed that they cannot marry the person they love in Virginia and it causes each of them great pain.  Bostic Decl. ¶ 18; London Decl. ¶ 20; Schall Decl. ¶ 31; Townley Decl. ¶ 20.

## ARGUMENT

## I.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE VIRGINIA'S MARRIAGE PROHIBITION IS UNCONSTITUTIONAL.

This Court should grant summary judgment to Plaintiffs because Virginia's Marriage

Prohibition violates Plaintiffs' due process and equal protection rights under the United States

Constitution as a matter of law. Accordingly, Virginia's Marriage Prohibition should be declared facially unconstitutional and permanently enjoined throughout the Commonwealth.[1]

This case raises a facial constitutional challenge to a Virginia constitutional provision and several Virginia statutes and the material facts are undisputed.[2]  Thus, summary judgment is appropriate.  *See* Fed. R. Civ. P. 56; *The News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Barghout v. Bureau of Kosher Meat and Food Control*, 66 F.3d 1337, 1340 (4th Cir. 1994).

### A.    By Denying Gay Men And Lesbians The Right To Marry, Virginia's Marriage Prohibition Violates Due Process.

The right to marry is one of the most fundamental rights—if not the most fundamental right—of an individual.  *Loving*, 388 U.S. at 12.  The Supreme Court has defined marriage as a right of liberty (*Zablocki*, 434 U.S. at 384), privacy (*Griswold v. Connecticut*, 381 U.S. 479, 486 (1965)), intimate choice (*Lawrence*, 539 U.S. at 574), and association (*M.L.B.*, 519 U.S. at 116).  "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred."  *Griswold*, 381 U.S. at 486.

---

[1]  Plaintiffs seek relief not only from Va. Const. Art. I, § 15-A, and Va. Code §§ 20-45.2, 45.3, but also from "any other Virginia law that bars same-sex marriage or prohibits the State's recognition of otherwise-lawful same-sex marriages from other jurisdictions."  *See* First Am. Compl., Prayer for Relief, ¶¶ 1, 2.  Plaintiffs' constitutional challenge therefore extends also to any Virginia case or common law that Defendants would enforce to withhold marriage from same-sex couples or deny recognition to the legal marriage of a same-sex couple.

[2]  In addition to considering the undisputed facts described above, this Court should take judicial notice of facts that are "generally known within the trial court's territorial jurisdiction" or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Where a party requests that the Court take judicial notice and supplies the Court with the necessary information, the Court must take notice of those facts.  *Id.* at 201(c)(2).  Plaintiffs request that this Court take judicial notice of the facts contained in Exhibits A, B, D–H, K, and N, attached to the Lustig Declaration.  *See Alizai v. MVM, Inc.*, 40 F. Supp. 2d 752, 756 (E.D. Va. 1998); *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991).

The right to marry has always been based on, and defined by, the constitutional liberty to select the partner of one's choice. *See generally Loving*, 388 U.S. 1; *Turner v. Safley*, 482 U.S. 78 (1987).  As the Supreme Court explained in *Lawrence*, "our laws and tradition afford constitutional protection to personal decisions relating to marriage . . . [and] family relationships" because of "the respect the Constitution demands for the autonomy of the person in making these choices"—and "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do."  539 U.S. at 574.  It is therefore unconstitutional to "deprive some couples . . . , but not other couples, of [the] rights and responsibilities [of marriage]." *Windsor*, 133 S. Ct. at 2694.

Defendants may contend that marriage—and thus the fundamental right to marry—excludes same-sex couples as a definitional matter, and that Plaintiffs are seeking access to a new right of "same-sex marriage."  But just as striking down Virginia's prohibition on marriage between persons of different races did not require the Supreme Court to recognize a new constitutional right to "interracial marriage" in *Loving*, invalidating Virginia's Marriage Prohibition would not require recognition of a new right to "same-sex marriage."  *See Lawrence*, 539 U.S. at 566, 574 (invalidating Texas's criminal prohibition on same-sex intimate conduct because it violated the fundamental right to personal sexual autonomy guaranteed by the Due Process Clause, and refusing to describe the "fundamental right" at stake narrowly as the right of "homosexuals to engage in sodomy").  Instead, it would vindicate the longstanding right of all persons to exercise "freedom of personal choice" in deciding whether and whom to marry, *id.*, and to accord to each citizen's decision "the same status and dignity."  *Windsor*, 133 S. Ct. at 2689.

The fundamental right of marriage is not limited to couples that might procreate, as some have asserted.  At the threshold, when the Virginia legislature passed the Affirmation of Mar-

riage Act, it declared that marriage should be "consummated . . . whether or not [the spouses] are reproductive in effect or motivation," thereby disavowing any connection between marriage and procreation.  House Bill No. 751 (2004).  And appropriately so, because the Supreme Court has never defined the right to marry in terms of the couple's ability or desire to produce or raise children.  Rather, the Supreme Court has expressly recognized that the right to marry extends to individuals unable to procreate with their spouse, *see Turner*, 482 U.S. at 95, and that married couples have a fundamental right not to procreate, *see Griswold*, 381 U.S. at 485.  In fact, the Supreme Court has held that even incarcerated prisoners with no right to conjugal visits have a fundamental right to marry because "[m]any important attributes of marriage remain . . . after taking into account the limitations imposed by prison life . . . [including the] expressions of emotional support and public commitment," the "exercise of religious faith," and the "expression of personal dedication," which "are an important and significant aspect of the marital relationship." *Turner*, 482 U.S. at 95–96.[3]

As in other States, the purposes of marriage in Virginia include "the state recognition and approval of a couple's choice to live with each other, to remain committed to one another and to form a household based on their own feelings about one another and to join in an economic partnership and support one another and any dependents."  *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 961 (N.D. Cal. 2010); *see also id.* at 993 ("The right to marry has been historically and

---

[3]  In any event, it is indisputable that thousands of gay and lesbian couples—including Plaintiffs Schall and Townley—do procreate. *See Windsor*, 133 S. Ct. at 2694 (recognizing laws prohibiting gay men and lesbians from marrying "humiliate[] tens of thousands of children now being raised by same-sex couples").  Thus, to the extent Virginia relies on "responsible procreation" (which is to say procreation within marriage) to justify Virginia's Marriage Prohibition, that interest would be served only by letting gay men and lesbians marry—not by prohibiting it and thus depriving the tens of thousands of children being raised by same-sex couples of the financial, social, and legal benefits of marriage.

remains the right to choose a spouse and, with mutual consent, join together and form a house-hold."). Marriage is a "far reaching legal acknowledgement of the intimate relationship between two people," and reflects the State's determination that a couple is "worthy of dignity in the community." *Windsor*, 133 S. Ct. at 2692. This is precisely the venerated, officially sanctioned relationship that Plaintiffs seek to enter because for Plaintiffs—as for the rest of society—marriage is "the most important relation in life." *Zablocki*, 434 U.S. at 384.

Virginia's withholding of this fundamental right from Plaintiffs has far-reaching implica-tions, denying them many of the legal, social, and financial benefits enjoyed by opposite-sex couples. As in other States, Virginia's "definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the protection of offspring, property interests, and the enforcement of marital responsibilities." *Windsor*, 133 S. Ct. at 2691 (internal quotation marks omitted); *see also Massachusetts v. U.S. Dep't of Health & Human Servs. ("Gill")*, 682 F.3d 1, 11 (1st Cir. 2012) ("Loss of survivor's social security, spouse-based medical care and tax benefits are major detriments on any reckoning. Provision for retirement and medical care are, in practice, the main components of the social safety net for vast numbers of Americans."); *Perry*, 704 F. Supp. 2d at 963 ("Material benefits, legal protections and social support resulting from marriage can increase wealth and improve psychological well-being for married spouses.").

For those reasons, laws—like the laws that comprise Virginia's Marriage Prohibition—that "interfere[ ] directly and substantially with the fundamental right to marriage" are subject to strict scrutiny, *Waters v. Gaston Cnty.*, 57 F.3d 422, 426 (4th Cir. 1995), and can be sustained only where the government meets its burden of establishing that the statutes are "narrowly drawn" to further a "compelling state interest[ ]." *Carey v. Population Servs. Int'l*, 431 U.S. 678,

686 (1977).  Because Defendants lack a compelling justification for prohibiting individuals of the same sex to marry, Virginia's Marriage Prohibition violates Plaintiffs' due process rights for the same reasons that they violate Plaintiffs' equal protection rights (described below).  *See Loving*, 388 U.S. at 12 (striking down anti-miscegenation law on both equal protection and due process grounds); *see also Lawrence*, 539 U.S. at 575 ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests.").  Indeed, far from satisfying the rigorous demands of strict scrutiny, Virginia's Marriage Prohibition cannot satisfy even *rational basis* review.  *See infra* Part B.3.

> **B.** **By Denying Gay Men And Lesbians The Right To Marry, Virginia's Marriage Prohibition Violates Equal Protection.**

Virginia's Marriage Prohibition also is antithetical to the "principles of equality" on which this "Nation . . . prides itself."  *Plyler v. Doe*, 457 U.S. 202, 219 (1982).  It creates a permanent "underclass" of hundreds of thousands of gay and lesbian Virginians, *id.*, who are denied the fundamental right to marry available to all other Virginians simply because of public disapproval of their constitutionally protected sexual identities.  *See Windsor*, 133 S. Ct. at 2694 (citing *Lawrence*, 539 U.S. at 588).  Virginia's Marriage Prohibition instructs all state and federal officials within Virginia, "and indeed all persons with whom same-sex couples interact, including their own children," that same-sex relationships are unworthy of dignity and respect.  *Id.*  In doing so, the laws relegate gay men and lesbians to a disadvantaged, stigmatized, second-class status in violation of the Equal Protection Clause.

> **1.** **Heightened Scrutiny Applies Because Virginia's Marriage Prohibition Discriminates On The Basis Of Sexual Orientation.**

Because Virginia's Marriage Prohibition classifies Virginia citizens on the basis of sexual orientation, denying gay men and lesbians the right to marry, this Court should apply strict scru-

tiny. The Supreme Court consistently has applied heightened scrutiny to laws that discriminate against a group that has experienced a "history of purposeful unequal treatment or ha[s] been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam) (internal quotation marks omitted); *see also United States v. Virginia*, 518 U.S. 515, 531 (1996) (noting "long and unfortunate history of sex discrimination").[4]

In addition to a history of discrimination based on a "characteristic" that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440–441 (1985) (internal quotation marks omitted), the Supreme Court has identified two additional factors that may be relevant to whether a classification triggers heightened scrutiny: (1) whether the distinguishing characteristic is "immutable" or beyond the group member's control, *see Lyng v. Castillo*, 477 U.S. 635, 638 (1986), and (2) whether the group is "a minority or politically powerless," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (internal quotation marks omitted). The Supreme Court has not considered these additional factors in every case (*see, e.g., Murgia*, 427 U.S. at 313), and the Supreme Court has applied heightened scrutiny in cases where those factors were not present. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995) (holding that all racial classifications are inherently suspect, even though many racial groups exercise substantial political power).

Although the Fourth Circuit has held that discrimination based on sexual orientation is subject to rational basis review, *see Veney v. Wyche*, 293 F.3d 726, 731–32 (4th Cir. 2002);

---

[4] This Court should also apply strict scrutiny under the Equal Protection Clause because Virginia's Marriage Prohibition directly and substantially interferes with Plaintiffs' fundamental right to marry. *See, e.g., Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 632-33 (1969); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (plurality op.).

*Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996), those decisions were premised on the absence of constitutional protection for same-sex intimate conduct—a premise that is now false. *See Veney*, 293 F.3d at 731 n.4 (noting that there "is no fundamental right to engage in homosexual acts generally"); *Thomasson*, 80 F.3d at 929 (noting that "it is legitimate for Congress to proscribe homosexual acts"). "In *Lawrence*, the Supreme Court plainly held that statutes criminalizing private acts of consensual sodomy between adults are inconsistent with the protections of liberty assured by the Due Process Clause of the Fourteenth Amendment." *MacDonald v. Moose*, 710 F.3d 154, 163 (4th Cir. 2013) (citing *Lawrence*, 539 U.S. at 578). This Court accordingly is free to reexamine whether discrimination based on sexual orientation is subject to heightened scrutiny. *See Faust v. S.C. State Highway Dep't*, 721 F.2d 934, 936 (4th Cir. 1983) (decisions that have been "sufficiently undermined by subsequent Supreme Court decisions . . . should no longer be followed").

Further, the Supreme Court's recent decision in *Windsor* demonstrates that a standard far more exacting than traditional rational basis review applies to laws that discriminate on the basis of sexual orientation. *See* 133 S. Ct. at 2707 (Scalia, J, dissenting) (noting that the majority did not apply rational basis review); *see also Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (applying heightened scrutiny to DOMA); *Gill*, 682 F.3d at 11 (same). In *Windsor*, the Court invalidated Section 3 of DOMA, which precluded federal recognition of marriages between individuals of the same sex. Rather than defer to the rationales that DOMA's proponents advanced to justify the law, *see* Br. for Bipartisan Legal Advisory Group of the U.S. House of Representatives, at 30–49, *United States v. Windsor* (No. 12-307), the *Windsor* Court explained that "the design, purpose, and effect" of the law were only the "beginning point in deciding whether it is valid under the Constitution." *Id.* at 2689. The Court then took into account the

fact that gay men and lesbians historically had been excluded unjustly from marriage, *id.* at 2689; that there was no principled basis for departing from the "long-established precept" that the "incidents, benefits, and obligations of marriage" should be uniform within each State, *id.* at 2692; and that the law was impermissibly "motivated by a 'bare . . . desire to harm' couples in same-sex marriages," *id.* at 2693–94, 2707.  The *Windsor* Court's conclusion—that DOMA violated due process and equal protection because the "purpose and practical effect of the law . . . [was] to impose a disadvantage, a separate status, and so a stigma" upon same-sex couples— comports with heightened scrutiny review, not rational basis, and confirms that heightened scrutiny is appropriate here.

**History of Discrimination.**  It is beyond dispute that "gay persons historically have been, and continue to be, the target of purposeful and pernicious discrimination due solely to their sexual orientation."  *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 432 (Conn. 2008).  "[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral." *Lawrence*, 539 U.S. at 571; *see also Veney*, 293 F.3d at 733-34 ("[W]e cannot ignore the fact that homosexuals are subject to bias-motivated attacks from heterosexuals.").  Federal courts therefore consistently recognize that "[g]ays and lesbians have been victims of a long history of discrimination."  *Perry*, 704 F. Supp. 2d at 981; *Gill*, 682 F.3d at 11 ("As with the women, the poor, and the mentally impaired, gays and lesbians have long been the subject of discrimination.").

This moral condemnation continues to find expression today in state-sanctioned discrimination.  Indeed, just last year, the Virginia legislature passed a law permitting adoption agencies to refuse adoptions based on the sexual orientation of the prospective parents.  *See* Va. Code § 63.2-1709.3.  Neither Virginia's Human Rights Act nor its Fair Housing Law prohibits discrimination on the basis of sexual orientation.  *See* Va. Code §§ 2.2-3901, 36-96.3.  Virginia's

hate crime law does not punish violence against individuals on the basis of their sexual orienta-tion, despite the fact that, since 2004, there have been at least 270 attacks in Virginia alone against individuals based on their sexual orientation. *See* Va. Code § 18.2-57(B); Lustig Decl. ¶ 17. And, in 2010, after Governor McDonnell issued an Executive Order that allowed discrimi-nation on the basis of sexual orientation in the state workforce, Attorney General Cuccinelli in-structed colleges and universities in Virginia to eliminate from their non-discrimination policies protections on the basis of "'sexual orientation,' 'gender identity,' 'gender expression,' or like classification." *See* Lustig Decl. Exs. I, J. This "history of purposeful unequal treatment" based on the sexual orientation of gay and lesbian individuals is the hallmark of a suspect classifica-tion. *Murgia*, 427 U.S. at 313 (internal quotation marks omitted).

  ***Contribution to Society.*** Like the suspect classifications of race, alienage, national origin, and religion, sexual orientation has absolutely no "relation to [the] ability" of a person "to perform or contribute to society." *City of Cleburne*, 473 U.S. at 440–41 (citation omitted). Sex-ual orientation is simply irrelevant to whether someone can make a meaningful contribution to the social, political, or cultural life of this Nation. Unlike age or mental disability—two classifi-cations that receive rational basis scrutiny (*Murgia*, 427 U.S. at 314; *City of Cleburne*, 473 U.S. at 446)—it is impossible to identify "real and undeniable" differences in the ability of gay men and lesbians and heterosexuals to function in, and contribute to, society. *City of Cleburne*, 473 U.S. at 444. Indeed, the only limitations on the ability of gay and lesbian individuals to partici-pate in all aspects of American life are those imposed by discriminatory laws or private discrimi-natory conduct.

  Same-sex couples are no less able to form long-lasting and successful relationships than opposite-sex couples. Indeed, "[s]ame-sex couples are identical to opposite-sex couples in the

characteristics relevant to the ability to form successful marital unions.  Like opposite-sex couples, same-sex couples have happy, satisfying relationships and form deep emotional bonds and strong commitments to their partners." *Perry*, 704 F. Supp. 2d at 967.  Gay and lesbian couples also are just as capable of raising well-adjusted children. *See id.* at 980–81 ("Children raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted.").  In the field of developmental psychology, "the research supporting this conclusion is accepted beyond serious debate." *Id.*[5]

**Immutability.**  Federal courts have recognized that "[s]exual orientation and sexual identity are immutable," *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), because "[s]exual orientation is fundamental to a person's identity," *Perry*, 704 F. Supp. 2d at 964–66. "Homosexuality is as deeply ingrained as heterosexuality," *Hernandez-Montiel*, 225 F.3d at 1093 (internal quotation marks omitted), and denying gay men and lesbians access to marriage rights "will not affect the gender choices of those seeking marriage." *Gill*, 682 F.3d at 14–15.  Therefore, sexual orientation is an immutable and "distinguishing characteristic that defines gays and lesbians as a discrete group." *Perry*, 704 F. Supp. 2d at 964–66; *see also Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012); *cf. Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (Alito, J.) (accepting definition of an "immutable characteristic" as one that "the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences") (internal quotation marks omitted).

---

[5]  *See, e.g.,* Amicus Br. for The Am. Psychological Ass'n, *et al.*, at 22-30, *Hollingsworth v. Perry* (No. 12-144); Amicus Br. for The Am. Psychological Ass'n, *et al.*, at 18-26, *United States v. Windsor* (No. 12-307); Amicus Br. for The Am. Sociological Ass'n, at 6-14, *United States v. Windsor* (No. 12-307) & *Hollingsworth v. Perry* (No. 12-144).

*Political Power.*  Although gay men and lesbians have enjoyed some recent success at the ballot box in some areas of the country, they unquestionably lack sufficient political power to eliminate significant statutory disadvantages at the state and federal level—particularly in Virginia.  *Cf. Frontiero v. Richardson*, 411 U.S. 677, 685–86 (1973) (plurality op.) (even though "the position of women in America has improved markedly in recent decades," the "long and unfortunate history of sex discrimination" requires application of heightened scrutiny).  Voters nationwide have used initiatives or referenda to repeal or prohibit marriage rights for gay and lesbian individuals 34 times; in contrast, such measures have been defeated just five times—and one of those victories was undone by voters in the next election cycle.  *See* Lustig Decl. Ex. K (The Washington Post, For a Change, Gay Rights Activists Welcome Election Day Results, Nov. 8, 2012 (describing victories in Maryland, Maine, Minnesota, and Washington, but noting that "North Carolina voters delivered another drubbing in a string of 30-plus statewide losses for gay-marriage activists")).

Moreover, gay and lesbian individuals have been unable to secure federal legislation to protect themselves from discrimination in housing, employment, or public accommodations; and they lack similar protections in 29 States, including Virginia.  *See* Va. Code §§ 2.2-3901, 36-96.3.  Indeed, even setting aside their dismal record in plebiscites concerning their right to marry, gay men and lesbians have lost approximately 70% of initiatives pertaining to other issues in the last 20 years—typically initiatives to pass, or prevent the repeal of, basic antidiscrimination protections that the majority and other minority groups already enjoy.

## 2. Heightened Scrutiny Applies Because Virginia's Marriage Prohibition Discriminates On The Basis Of Sex.

Virginia's Marriage Prohibition should also be subject to heightened scrutiny because it classifies Virginia citizens on the basis of sex.  Classifications based on sex can be sustained on-

ly where the government demonstrates that they are "substantially related" to an "important governmental objective." *Virginia*, 518 U.S. at 533 (internal quotation marks omitted); *Gill*, 682 F.3d at 9 ("Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective.").

Virginia's Marriage Prohibition classifies Plaintiffs based on their sex because Plaintiffs Bostic and London would be able to marry each other in Virginia if one of them were female, and Plaintiffs Schall's and Townley's marriage would be recognized in Virginia as valid if one of them were male. The Equal Protection Clause prohibits such "differential treatment or denial of opportunity" based on a person's sex in the absence of an "exceedingly persuasive" justification. *Virginia*, 518 U.S. at 532–33 (internal quotation marks omitted). The Commonwealth offers none.

### 3. Virginia's Marriage Prohibition Cannot Survive Rational Basis Review, Let Alone Heightened Scrutiny.

Virginia's Marriage Prohibition is unconstitutional even under rational basis review because it irrationally deprives gay and lesbian individuals of the right to marry. Rational basis review does not mean no review at all. Government action that discriminates against a discrete class of citizens must "bear[ ] a rational relation to some legitimate end." *Romer*, 517 U.S. at 631. The State's supposed rationales for enacting the law at issue "must find some footing in the realities of the subject addressed by the legislation," *Heller v. Doe*, 509 U.S. 312, 321 (1993), and must be ones that could "reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111 (1979).

Even where there is a legitimate purpose that the government conceivably might have adopted in enacting the law, the Equal Protection Clause further requires that the State's disparate treatment bear at least a rational relationship to the governmental objective. *City of*

*Cleburne*, 473 U.S. at 446.  A "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* at 447.  By "insist[ing] on knowing the relation between the classification adopted and the object to be attained," courts "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S at 632, 633.

In this case, Defendants cannot identify any rational basis for excluding gay and lesbian individuals from all of the benefits and responsibilities of marriage.  None of the grounds typically advanced by proponents of such prohibitions bears even a rational relationship to the sweeping laws at issue here.

> **a.      Virginia's Marriage Prohibition Cannot Be Justified By A Desire To Promote Responsible Procreation Or Create Optimal Child-Rearing Conditions.**

Defendants cannot rely on an asserted interest in promoting so-called "responsible procreation" or creating a child-rearing environment they believe to be optimal.  At the threshold, there is simply no evidence to suggest and no reason to believe that prohibiting gays and lesbians from marrying will increase "responsible procreation" among heterosexuals or the number of children raised in assertedly optimal conditions.  The availability of marriage to gay men and lesbians has no effect on the ability of heterosexual couples to have and raise children.

The Virginia legislature accordingly disavowed any such purpose when it enacted the Affirmation of Marriage Act, declaring that marriage should be limited to opposite-sex couples "whether or not they are reproductive in effect or motivation."  House Bill No. 751.  That is consistent with the Supreme Court's recognition that the right to marry extends to individuals unable to procreate with their spouse, *see Turner*, 482 U.S. at 95, and that married couples have a fundamental right *not* to procreate, *see Griswold*, 381 U.S. at 485–86.  And insofar as Virginia (like all States) permits marriage between individuals who are unable or unwilling to bear children, or

who simply have no desire for children, *see* Lustig Decl. Ex. L (Va. Dep't of Health, *Marriage Requirements*, http://www.vdh.state.va.us/vital_records/marry.htm), Virginia's Marriage Prohibition is a tellingly underinclusive means of achieving whatever procreative ends the Commonwealth may assert as justifying the sweeping restrictions Virginia's Marriage Prohibition places on marriage.

Sometimes, a "means of pursuing [an] objective" can be "so woefully underinclusive as to render belief in that purpose a challenge to the credulous." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see also Romer*, 517 U.S. at 633; *Fla. Star v. B.J.F.*, 491 U.S. 524, 540–41 (1989). If Virginia's Marriage Prohibition was intended to reserve marriage for couples that can procreate or raise children, it makes "no sense in light of how [it treats] other groups similarly situated in relevant respects." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001); *cf. Lawrence*, 539 U.S. at 604–05 (Scalia, J., dissenting) (Absent "moral disapprobation . . . what justification could there possibly be for denying the benefits of marriage to homosexual couples exercising 'the liberty protected by the Constitution'? Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry.") (citations and alteration omitted). The far more logical and obvious reason that Virginia denies marriage to gay men and lesbians is that they are gay.

Indeed, far from aiding children, or ensuring they are raised in more "optimal" environments, Virginia's Marriage Prohibition in fact does great damage to the many thousands of children in the Commonwealth being raised by gay men and lesbians, including Plaintiffs Schall's and Townley's daughter, E. S.-T. Virginia's Marriage Prohibition "bring[s] financial harm to children of same-sex couples" by, among other things, "rais[ing] the cost of health care for families by taxing health benefits provided by employers to the workers' same-sex spouses." *Wind-*

*sor*, 133 S. Ct. at 2695.  And even more seriously, laws like Virginia's Marriage Prohibition "humiliate[]" children raised by gay and lesbian couples, making it "more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Windsor*, 133 S. Ct. at 2694.  Thus, if Plaintiffs Schall's and Townley's marriage were recognized in Virginia, for example, they would have more resources to provide for E. S.-T.; they would spend less money on attorneys, taxes, and insurance; and the State's custodial and support laws would provide E. S.-T. with the protections they provide to children of opposite-sex married couples.  Schall Decl. ¶¶ 21, 28−29; Townley Decl. ¶¶ 9, 17−19. And E. S.-T. would not have to live with the daily pain and humiliation of having her State declare in its governing charter that her family is second-rate and unworthy not only of marriage, but of any relationship or status that might approximate it.  Only allowing same-sex couples to marry would benefit children in Virginia.  *See Perry*, 704 F. Supp. 2d at 963 ("The tangible and intangible benefits of marriage flow to a married couple's children.").

> **b.    Virginia's Marriage Prohibition Cannot Be Justified By Tradition Or A Fear Of Change.**

Tradition and history are a manifestly insufficient basis for a State to impair a person's constitutionally protected right to marry.  "[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack[.]"  *Williams v. Illinois*, 399 U.S. 235, 239 (1970); *see also Heller*, 509 U.S. at 326 ("Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis.").  A State's practice of restricting its citizens' constitutional rights thus cannot be perpetuated merely "for its own sake."  *Romer*, 517 U.S. at 635.  As the Supreme Court recognized when invalidating a criminal prohibition on same-sex intimate conduct, "times can blind us to

certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence*, 539 U.S. at 579.

Accordingly, Virginia's longstanding tradition of prohibiting marriage between individuals of the same sex cannot shield its marriage laws from federal constitutional scrutiny any more than Virginia's longstanding tradition of prohibiting marriage by individuals of different races— which dated back to "the colonial period"—could shield its anti-miscegenation law from the Fourteenth Amendment's requirements. *Loving*, 388 U.S. at 6; *see also Lawrence*, 539 U.S. at 577–78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack.") (citation omitted).

In any event, prohibiting marriage by gay and lesbian individuals does not plausibly preserve or strengthen the tradition of marriage in Virginia. Allowing same-sex couples to marry will not impair *in any way* the ability of individuals who wish to marry a person of the opposite sex to exercise their own constitutional right to marry. *Cf. Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013) (although heterosexuals might have "a keen interest in the issue," permitting marriages between individuals of the same sex does not cause opposite-sex couples to suffer any "concrete and particularized injury"). Removing the unconstitutional state-law impediment to marriage by gay and lesbian individuals will simply put an end to the irrational denial of the right to marry to a group of individuals who have historically been excluded from this most "basic civil right[ ] of man." *Loving*, 388 U.S. at 12 (internal citation omitted).

Indeed, allowing same-sex couples the right to marry will not impair the institution of marriage any more than discarding the earlier race restrictions or gender inequality that once were prominent features of civil administration of marriage. *See Perry*, 704 F. Supp. 2d at 960 ("Eliminating gender and race restrictions in marriage has not deprived the institution of mar-

riage of its vitality.").  The marriage rate for opposite-sex couples in States that allow same-sex couples to marry has not declined.  *See* Lustig Decl. Ex. M (Alexis Dinno and Chelsea Whitney, *Same Sex Marriage and the Perceived Assault on Opposite Sex Marriage*, PLoS One (2013)).  Indeed, according to statistics from the United States Census Bureau, "the divorce rate in the states that allow gay marriage is 20% lower in than in states that prohibit it."  Lustig Decl. Ex. N (Edward McClelland, *States That Allow Same-Sex Marriage Have Lower Divorce Rates*, NBC Chicago, Jun. 27, 2013).

Because "[p]ermitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages," *Perry*, 704 F. Supp. 2d at 972, a misguided desire to cling to tradition or guard against change cannot justify Virginia's Marriage Prohibition.

### c. Virginia's Marriage Prohibition Cannot Be Justified By Federalism Or An Interest In Democratic Self-Governance.

Nor can Defendants justify Virginia's Marriage Prohibition by pointing to principles of federalism or Virginia's interest in democratic self-governance.  Although marriage has traditionally been regulated by the States, the States' power to regulate marriage unquestionably is constrained by "the commands of the Fourteenth Amendment."  *Loving*, 388 U.S. at 7 (citing *Meyer v. State of Nebraska*, 262 U.S. 390 (1923)); *see also Windsor*, 133 S. Ct. at 2691 ("State laws defining and regulating marriage, of course, must respect the constitutional rights of persons[.]") (citing *Loving*, 388 U.S. at 7).  Where States have exceeded their powers by imposing unconstitutional restrictions on marriage, federal courts have not hesitated to invalidate those restrictions.  *See, e.g.*, *Loving*, 388 U.S. at 11–13; *Turner*, 482 U.S. at 94–99; *Perry*, 704 F. Supp. 2d at 1003.

  **d.**  **Undisputed Evidence Demonstrates That Virginia's Marriage Prohibition Was Motivated By A Bare Desire To Make Gay Men And Lesbians Unequal To Everyone Else.**

Undisputed evidence demonstrates that Virginia's Marriage Prohibition was premised principally upon moral disapproval of homosexuality. This is a demonstrably improper ground for abridging constitutional rights. The Supreme Court has made clear that "[m]oral disapproval" of gay men and lesbians, "like a bare desire to harm the group, is an interest that is insufficient to satisfy" even rational basis review. *Lawrence*, 539 U.S. at 582. While "[p]rivate biases may be outside the reach of the law," the "law cannot, directly or indirectly, give them effect" at the expense of a disfavored group's fundamental constitutional rights. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984); *see also Lawrence*, 539 U.S. at 577 ("[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice.") (citation omitted) (internal quotation marks omitted).

In examining the statutory language and legislative history of DOMA earlier this year, the Supreme Court found that "interference with the equal dignity of same-sex marriages" was the "essence" of the law—and that the law was unconstitutional for that reason. *Windsor*, 133 S. Ct. at 2693. As the Court explained, "the avowed purpose and practical effect of the law" was to "impose a disadvantage, a separate status, and so a stigma" upon gay and lesbian relationships, relegating them to an inferior status. *Id.* "The stated purpose of the law was to promote an interest in protecting the traditional moral teachings reflected in heterosexual-only marriage laws." *Id.* Even the name of the law—the "Defense of Marriage Act"—suggested an improper purpose. *Id.*

Virginia's Marriage Prohibition—which includes the "Affirmation of Marriage Act"—suffers from exactly the same failings and must therefore suffer the same fate. These laws, just like DOMA, were enacted to "deprive some couples . . . , but not other couples, of both rights

and responsibilities," thereby "writ[ing] inequality" into the Virginia Constitution and statutory code. *Windsor*, 133 S. Ct. at 2694. In enacting the laws, members of Virginia's legislature and executive branch publicly denounced gay and lesbian relationships as "intrinsically wrong" and in contravention of "natural law," Lustig Decl. Exs. G, H, and made legislative findings pronouncing that "homosexual behavior" is "detriment[al] [to] all citizens regardless of their sexual orientation or inclination." House Bill No. 751. These same officials and others promoted Virginia's Marriage Prohibition as a necessary shield to protect the "traditional family," which gay men and lesbians had purportedly been "attacking" for 40 years. Lustig Decl. Exs. D, E. Similarly, campaign materials supporting the Marshall/Newman Amendment decried same-sex couples as contravening "God's Design," and proponents of the Amendment claimed it was necessary to resist the "real danger" of gay and lesbian individuals "attacking" the traditional family. Lustig Decl. ¶ 16, Ex. B. The laws even cited DOMA itself as a leading justification. House Bill No. 751. Like DOMA, "interference with the equal dignity of same-sex marriages" is unquestionably the "essence" of Virginia's Marriage Prohibition. *Windsor*, 133 S. Ct. at 2693.

The sweeping breadth of Virginia's Marriage Prohibition—which prohibits gay men and lesbians not only from marrying, but from participating in *any* of the "rights, benefits, obligations, qualities, or effects of marriage," Va. Const. art. I, § 15-A—also itself provides "strong evidence of a law having the purpose and effect of disapproval of that class." *Windsor*, 133 S. Ct. at 2693. Whatever inadequate justifications Defendants muster for depriving gay men and lesbians the fundamental right to marry cannot possibly justify the Commonwealth's refusal to recognize couples who have *already* been lawfully married elsewhere. Va. Code § 20-45.2. Nor can they possibly justify depriving same-sex couples the ability to enter into basic "contract[ual] . . . arrangement[s]." Va. Code § 20-45.3. "By its great reach, [Virginia's Marriage Prohibition]

29

touches many aspects of married and family life, from the mundane to the profound," causing "same-sex . . . couples [to] have their lives burdened, by reason of government decree, in visible and public ways." *Windsor*, 133 S. Ct. at 2694. As with DOMA, "no legitimate purpose overcomes the purpose and effect to disparage and injure" gay men and lesbians in this manner, and Virginia's Marriage Prohibition must be struck down as unconstitutional. *Id.* at 2696.

*   *   *

Based solely on their sexual orientation, Plaintiffs and thousands of other Virginians are being deprived of their fundamental right to enjoy life's most sacred and important relationship. Allowing them to marry the person they love (or, in the case of Plaintiffs Schall and Townley, recognizing that they have *already* married the person they love) will not diminish the value or status of anyone else's marriage or harm a single Virginian in any conceivable way. But continuing to refuse gay men and lesbians the basic dignity that is afforded to every other Virginian causes pain, stigma, and humiliation to same-sex couples and to their children, including E. S.-T. The federal Constitution—as well as bedrock principles of liberty, equality, and decency—does not permit Virginia to inflict such needless harm on its citizens. This Court should grant summary judgment to Plaintiffs, declare Virginia's Marriage Prohibition to be facially unconstitutional, and permanently enjoin its enforcement throughout the Commonwealth.

### C.  *Baker v. Nelson* Does Not Control The Outcome Of This Case.

In *Baker v. Nelson*, the Supreme Court dismissed "for want of a substantial federal question" an appeal from a Minnesota Supreme Court decision rejecting federal due process and equal protection challenges to the State's refusal to issue a marriage license to a same-sex couple. 409 U.S. 810 (1972). The Supreme Court's summary dismissals are binding on lower courts only "on the precise issues presented and necessarily decided," *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam), and only to the extent that they have not been undermined by

subsequent "doctrinal developments" in the Supreme Court's case law.  *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (internal quotation marks omitted).

The Supreme Court's summary disposition of the due process question in *Baker* is not controlling here because *Baker* cannot be reconciled with the Court's subsequent decisions in *Lawrence* or *Windsor*.  *Lawrence* explicitly recognized that the Constitution "afford[s] . . . protection to personal decisions relating to marriage, procreation, contraception, family relationships, [and] child rearing" and that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do."  539 U.S. at 574.  Similarly, *Windsor* recognized that individuals' "moral and sexual choices," including their decision to enter into a lawful marriage with a person of the same sex, are protected by the Constitution.  133 S. Ct. at 2694; *see also Turner*, 482 U.S. at 95; *Zablocki*, 434 U.S. at 384 ("the right to marry is of fundamental importance for all individuals").

*Baker*'s equal protection ruling also has no precedential force in this case.  As an initial matter, *Baker* presented an equal protection challenge based solely on sex discrimination grounds and therefore cannot foreclose Plaintiffs' claim that Virginia's Marriage Prohibition discriminates against gay and lesbian individuals on the basis of their sexual orientation.  *See* Jurisdictional Statement at 16, *Baker v. Nelson* (No. 71-1027) ("The discrimination in this case is one of gender.").  And *Baker* was decided before the Supreme Court recognized that sex is a quasi-suspect classification, *see Craig v. Boren*, 429 U.S. 190, 197 (1976); *Frontiero*, 411 U.S. at 688 (plurality op.), and before the Court recognized in *Romer* and *Windsor* that the Constitution shelters gay men and lesbian from discrimination based on their sexual orientation.  Finally, *Baker*, of course, could not and did not address a record, like that of *Romer*, *Perry*, *Windsor*, and now

here, where a legislature or electorate had enacted state laws to impose second-class (or worse) status on homosexual individuals and their relationships and families.

## II. AT A MINIMUM, THIS COURT SHOULD PRELIMINARILY ENJOIN APPLICATION OF VIRGINIA'S MARRIAGE PROHIBITION TO THE PLAINTIFFS.

If this Court is not inclined to grant summary judgment at this time, then it should, at a minimum, provide Plaintiffs with a preliminary injunction that requires the Defendants to cease enforcement of Virginia's Marriage Prohibition as to them pending final judgment. "A plaintiff 'seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Because Plaintiffs are likely to succeed on the merits of their claims that Virginia's Marriage Prohibition violates their due process and equal protection rights—and because prohibiting the Commonwealth from continuing to impair Plaintiffs' due process and equal protection rights would prevent irreparable harm to Plaintiffs, impose no material burden on Defendants, and promote the public interest in safeguarding fundamental constitutional rights—this Court should preliminarily enjoin Defendants from enforcing Virginia's Marriage Prohibition insofar as it precludes Plaintiffs from getting married or being recognized as married in Virginia.

### A. Plaintiffs Are Likely To Succeed On Their Constitutional Claims.

As explained above, Virginia's Marriage Prohibition violates Plaintiffs' right to due process under the Fourteenth Amendment because it impermissibly impairs Plaintiffs' fundamental constitutional right to marry. The laws also violate Plaintiffs' right to equal protection under the Fourteenth Amendment because they burden a fundamental constitutional right and because they

discriminate unlawfully against Plaintiffs on the basis of their sexual orientation and their sex. Therefore, Plaintiffs are likely to prevail in this litigation.

**B.**    **Plaintiffs Are Likely To Suffer Irreparable Harm In The Absence Of A Preliminary Injunction.**

The denial of Plaintiffs' constitutional rights constitutes per se irreparable harm.  *See El-rod v. Burns*, 427 U.S. 347, 373 (1976); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978); *Darr v. Massinga*, 699 F. Supp. 508, 535 (D. Md. 1988).  Indeed, a district court "has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right."  *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960) (per curiam).  Plaintiffs Bostic and London have attempted to exercise their fundamental constitutional right to marry by applying for a marriage license in Virginia, and they have been denied a marriage license on the sole ground that they are seeking to marry a person of the same sex.  They feel "tremendous pain and sadness" as a result the Commonwealth's refusal to allow them to marry—humiliation borne of the knowledge that Virginia views their relationship as "not good enough" for marriage and worth "'less than' other couples."  Bostic Decl. ¶ 18; London Decl. ¶ 20.  They "carry that pain" with them every day their fundamental rights are denied.  Bostic Decl. ¶ 18; London Decl. ¶ 20.

Plaintiffs Schall and Townley likewise have been denied the social and legal benefits they would enjoy if the Commonwealth recognized their lawful California marriage.  But because the "Commonwealth rejects the decision that [they] have made to marry," they are denied the benefits afforded to married opposite-sex couples.  Schall Decl. ¶¶ 30−31; Townley Decl. ¶ 20.  They and, cruelly, their daughter, E. S.-T., must suffer the Commonwealth's stigmatization of their family as second-rate and unworthy of either the State's approbation or its protection.  Schall Decl. ¶¶ 30−31; Townley Decl. ¶ 20 ("The Commonwealth's discrimination impacts me,

Carol, and E. S.-T. because we all suffer from the stigma that we feel."). Thus, as long as Virginia's Marriage Prohibition remains on the books, Plaintiffs will be denied their "freedom of personal choice in matters of marriage . . . protected by the Due Process Clause," *Cleveland Bd. of Educ.*, 414 U.S. at 639, and their right to be free from "arbitrary and invidious discrimination" guaranteed by the Equal Protection Clause. *Loving*, 388 U.S. at 10.

There is no adequate remedy at law for the denial of these fundamental constitutional guarantees, and for the emotional distress, psychological harm, and humiliation that Plaintiffs have suffered as a result of being denied the right to marry the person they love. Plaintiffs are involved in a loving and committed relationship with a person with whom they plan to spend the rest of their lives, and they seek nothing more than the same official respect, recognition, and approval of that relationship that is accorded to opposite-sex couples. Bostic Decl. ¶¶ 4−5, 18; London Decl. ¶¶ 5−6; Schall Decl. ¶¶ 5, 7, 26, 31; Townley Decl. ¶¶ 3, 6, 19. Financial damages cannot make Plaintiffs whole for being excluded from the most "intimate" and "sacred" of life's relationships. *Zablocki*, 434 U.S. at 384 (citation omitted).

### C.      A Balance Of The Equities Favors Plaintiffs.

A preliminary injunction is appropriate because an order enjoining the enforcement of Virginia's Marriage Prohibition against Plaintiffs in this case would not burden the rights of Defendants or third parties, and would promote the Nation's commitment to equal rights.

Requiring the Commonwealth of Virginia to issue marriage licenses to two otherwise-qualified same-sex couples would not remotely burden Defendants' rights. It would impose no significant administrative hardship for Defendants to issue a marriage license to Plaintiffs Bostic and London, or to recognize the legal marriage of Plaintiffs Schall and Townley. It is equally implausible that extending the right to marry to these two couples would impose a material burden on the public fisc. As the Fourth Circuit recently explained, "a state is in no way harmed by

issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cnty.*, No. 11-1314, 2013 WL 3336825, at *190 (4th Cir. July 3, 2013) (citation omitted).

Nor will a preliminary injunction burden the rights of third parties.  Preliminarily enjoining the enforcement of Virginia's Marriage Prohibition insofar as applied to Plaintiffs alone will not impair the right of opposite-sex couples to marry.  *Cf. Hollingsworth*, 133 S. Ct. at 2659. Moreover, any risk that the validity of Plaintiffs' marriages would be compromised if this Court or an appellate court later upheld Virginia's Marriage Prohibition falls squarely on Plaintiffs alone.

### D.      An Injunction Is In The Public Interest.

Far from burdening the rights of third parties, a preliminary injunction "upholding constitutional rights serves the public interest." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).  A preliminary injunction vindicating Plaintiffs' fundamental constitutional rights would advance the shared interest of all citizens in enforcing the Constitution's guarantees and reinforce this "Nation's basic commitment . . . to foster the dignity and well-being of all persons within its borders." *Goldberg v. Kelly*, 397 U.S. 254, 264–65 (1970).

### CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant them summary judgment or, in the alternative, enter a preliminary injunction precluding application of Virginia's Marriage Prohibition to Plaintiffs pending final judgment.

Dated:  September 30, 2013                     Respectfully submitted,

                                               /s/ Charles B. Lustig
                                               Thomas B. Shuttleworth, VSB # 13330
                                               tshuttleworth@srglaw.com

Robert E. Ruloff, VSB # 13471
rruloff@srgslaw.com
Charles B. Lustig, VSB # 29442
clustig@srgslaw.com
SHUTTLEWORTH, RULOFF, SWAIN, HAD-
DAD & MORECOCK, P.C.
4525 South Blvd., Suite 300
Virginia Beach, VA 23452
T: (757) 671-6000
F: (757) 671-6004

David Boies, *pro hac vice pending*
dboies@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
333 Main St.
Armonk, NY 10504
T: (914) 749-8200
F: (914) 749-8300

Robert B. Silver, *pro hac vice pending*
rsilver@bsfllp.com
Joshua I. Schiller, *pro hac vice pending*
jischiller@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
T: (212) 446-2300
F: (914) 446-2350

William A. Isaacson, *pro hac vice pending*
wisaacson@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
T: (202)237-2727
F: (202)237-6131

Jeremy M. Goldman, *pro hac vice pending*
jgoldman@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
T: (510) 874-1000
F: (510)874-1460

*Counsel for Plaintiffs*

Theodore B. Olson, *pro hac vice pending*
tolson@gibsondunn.com
Matthew D. McGill, *pro hac vice pending*
mmcgill@gibsondunn.com
Amir Tayrani, *pro hac vice pending*
atayrani@gibsondunn.com
Chantale Fiebig, *pro hac vice pending*
cfiebig@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
T: (202) 955-8668
F: (202) 467-0539

Theodore J. Boutrous, Jr., *pro hac vice pending*
tboutrous@gibsondunn.com
Joshua S. Lipshutz, *pro hac vice pending*
jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7000
F: (213) 229-7520

*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of September, 2013, I electronically filed the

foregoing Memorandum In Support Of Plaintiffs' Motion For Summary Judgment Or, In The

Alternative, Preliminary Injunction with the Clerk of the Court using the CM/ECF system which

will send electronic notification of such filing to E. Duncan Getchell, Jr., Esq., Counsel for

Defendant Rainey, and to David B. Oakley, Esq., Counsel for Defendant Schaefer.

Respectfully submitted,

/s/ Charles B. Lustig
Thomas B. Shuttleworth, VSB # 13330
tshuttleworth@srgslaw.com
Robert E. Ruloff, VSB # 13471
rruloff@srgslaw.com
Charles B. Lustig, VSB # 29442
clustig@srgslaw.com
SHUTTLEWORTH, RULOFF, SWAIN,
HADDAD & MORECOCK, P.C.
4525 South Blvd., Suite 300
Virginia Beach, VA 23452
T: (757) 671-6000
F: (757) 671-6004

David Boies, *pro hac vice pending*
dboies@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
333 Main St.
Armonk, NY 10504
T: (914) 749-8200
F: (914) 749-8300

Robert B. Silver, *pro hac vice pending*
rsilver@bsfllp.com
Joshua I. Schiller, *pro hac vice pending*
jischiller@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
T: (212) 446-2300
F: (914) 446-2350

Theodore B. Olson, *pro hac vice pending*
tolson@gibsondunn.com
Matthew D. McGill, *pro hac vice pending*
mmcgill@gibsondunn.com
Amir Tayrani, *pro hac vice pending*
atayrani@gibsondunn.com
Chantale Fiebig, *pro hac vice pending*
cfiebig@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
T: (202) 955-8668
F: (202) 467-0539

Theodore J. Boutrous, Jr., *pro hac vice pending*
tboutrous@gibsondunn.com
Joshua S. Lipshutz, *pro hac vice pending*

William A. Isaacson, *pro hac vice pending*
wisaacson@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
T: (202)237-2727
F: (202)237-6131

Jeremy M. Goldman, *pro hac vice pending*
jgoldman@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
T: (510) 874-1000
F: (510)874-1460

*Counsel for Plaintiffs*

jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7000
F: (213) 229-7520

*Counsel for Plaintiffs*