**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | | |
|---|---|---|
| TIMOTHY B. BOSTIC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13-cv-00395 |
| | ) | |
| JANET M. RAINEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT JANET M. RAINEY'S MEMORANDUM IN OPPOSITION

The right to ask the judicial branch to coercively alter a State's traditional definition of marriage was recognized nowhere in this country until 2003–and then only under the constitution of a single state. It has never been recognized under the United States Constitution by any appellate court or federal district court from which an appeal lay. *See Perry* v. *Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010), *aff'd on other grounds*, *Perry* v. *Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated for want of jurisdiction*, *Hollingsworth* v. *Perry*, 133 S. Ct. 2652 (2013). Furthermore, unless and until *Baker* v. *Nelson*, 409 U.S. 810 (1972), is overturned, a claim that maintaining the traditional definition of marriage under state law violates either the Equal Protection or Due Process Clauses of the Fourteenth Amendment fails to present a substantial federal question. Finally, Virginia's definition of marriage survives constitutional scrutiny under established doctrine.

## DEFENDANT RAINEY'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED LEGISLATIVE FACTS

1.      Denied. Since 1607, Virginia law has defined the institution of marriage as a union between a man and a woman. Virginia Code § 20-45.2 speaks for itself.

2.      Denied that Plaintiffs have fully stated the provisions of Virginia Code § 20-45.2 which speaks for itself in any event.  Denied that Virginia Code § 20-45.2 alters the common law.  Denied that Plaintiffs have acknowledged the rational bases supporting it.

3.      Denied that the 2004 amendment of Virginia Code § 20-45.3 amended the definition of marriage.  Denied that Plaintiffs have fully quoted the 2004 amendment to Virginia Code § 20-45.3, which speaks for itself, or have acknowledged the rational bases underlying it.

4.      Denied that the 2004 amendment of Virginia Code § 20-45.3 amended the definition of marriage.  Denied that Plaintiffs have fully quoted the 2004 amendment to Virginia Code § 20-45.3, which speaks for itself, or have acknowledged the rational bases underlying it. Denied that any party has standing to challenge the civil union provisions of the act.

5.      Admitted that the Affirmation of Marriage Act was known as House Bill Number 751 in the Virginia House of Delegates and was sponsored by Marshall, R.G., Albo, Black, Cole and Welch.

6-12.   Denied that House Bill Number 751, which speaks for itself, is accurately captured in the quoted phrases.  The bill had eight whereas clauses and three paragraphs of legislative findings including traditional propositions usually advanced in defense of the conjugal definition of marriage.  These provisions also reflected political process concerns.

13-14. Denied that as a matter of evidence or substance the hearsay statement of a member of a multimember legislative body can be received or considered on summary judgment or properly accorded weight under the rational basis test.

15.     Denied that Virginia Constitution article I, § 15-A, which speaks for itself, was designated the Marshall/Newman Amendment.  Admitted that article I, § 15-A was ratified in 2006.

2

16-17.  Virginia Constitution article I, § 15-A speaks for itself.  Denied that any party has standing to challenge the civil union provisions of Virginia Constitution article I, § 15-A.

18.     Denied that Plaintiffs have completely and accurately summarized the opinion, which speaks for itself, or have completely and accurately acknowledged its context.   In substance, it opined that existing contractual rights by those in same-sex relationships would not be impaired under the common law by the amendment.  Taking care that this was so is evidence that the amendment did not have a bare design to harm under the *Windsor* animus theory.  The opinion has been vindicated by subsequent events.

19.     Denied as a matter of evidence or substance that such hearsay statements may be received or given weight under the rational basis test.

20.     Denied that as a matter of evidence or substance the hearsay statement of a member of a multimember legislative body can be received on summary judgment or be properly given weight under the rational basis test.

21-23. Denied that as a matter of evidence or substance the hearsay statement of a member of a multimember legislative body can be received or considered on summary judgment or properly accorded weight under the rational basis test.

24.     These documents speak for themselves.   As a matter of law, colleges and universities may not adopt public policy contrary to the public policy established by the General Assembly.  This includes public policy established by the explicit declination of the General Assembly to act with respect to a particular subject.

25.     Virginia Code § 63.2-1709.3 speaks for itself.

26-27. Like most states Virginia does not provide special protection based upon sexual orientation.  Virginia Code §§ 2.2-3901, 18.2-57(B), and 36-96.3 speak for themselves.

28.     Denied that as a matter of evidence or substance this hearsay may properly be considered on summary judgment.  Denied that Plaintiffs provide evidence that the date 2004 or the enactment are causally linked to the data sought to be adduced or are otherwise linked to Plaintiffs' claims.

29.     Admitted.

30.     Admitted that the Clerk's duties respecting marriage are statutory and that Virginia Code § 20-14 speaks for itself.

31-33.  Admitted that the Clerk's duties respecting marriage are statutory and that Virginia Code §§ 20-13, -14, and -33 speak for themselves.

34.     Because Defendant Schaefer did not deny a federal right to Plaintiffs, he is not a person under 42 U.S.C. § 1983 acting under the color of state law for purposes of this suit.

35.     Admitted.

36-41.  Admitted that Defendant Rainey's duties are statutory and that Virginia Code §§ 32.1-252, -261, -262, -267, and -268.1 speak for themselves.

42.     Because Defendant Rainey did not deny a federal right to Plaintiffs, she is not a person under 42 U.S.C. § 1983 acting under color of state law for purposes of this suit.

43-48.  For purposes of cross motions for summary judgment, Defendant Rainey does not contest these averments respecting Bostic and London.

49-50.  For purposes of cross motions for summary judgment, Defendant Rainey does not contest these averments respecting Bostic and London unless and to the extent contested by the Clerk.

51-59.  For purposes of cross motions for summary judgment, Defendant Rainey does not contest these averments respecting Schall and Townley.

60.     For purposes of cross motions for summary judgment, Defendant Rainey does not contest that Schall and Townley were legally married under the laws of California.

61.     For purposes of cross motions for summary judgment, Defendant Rainey does not contest these averments respecting Schall and Townley.

62.     Denied because leaving the Commonwealth in order to contract a marriage not recognized in Virginia provides an independent legal ground for voiding a marriage. *Heflinger* v. *Heflinger*, 136 Va. 289, 306, 118 S.E. 316, 321 (1923).

63-67.  For purposes of cross motions for summary judgment, Defendant Rainey does not contest these averments respecting Schall and Townley.

68-69.  Denied that opinion—especially lay opinion—on the scope, effect and the meaning of law or statutes can be properly received or considered for purposes of cross motions for summary judgment.

70.     Denied that "agreements between Plaintiff Schall and Townley concerning custody, care, or financial support for E. S.-T. could be declared by a court to be void and unenforceable" inasmuch as the September 14, 2006 opinion of the Attorney General to the contrary is a correct statement of the law.  *See* 2006 Op. Va. Att'y Gen. 55, 64.  Denied that lay opinion on the scope, effect and the meaning of law can be properly received or considered on summary judgment.

71.     For purposes of cross motions for summary judgment, Defendant Rainey does not contest these averments respecting Schall and Townley.

72.     Denied that claims of emotional distress by themselves satisfy the *Windsor* animus test absent a showing of a bare design to harm; a showing not made or makeable on this record of legislative facts.

73-81. Denied as a matter of law that opinion evidence—especially lay, legal opinion evidence—may be received on motion for summary judgment to establish the meaning, effect or application of domestic law.

82.    Denied that claims of emotional distress by themselves satisfy the *Windsor* animus test absent a showing of a bare design to harm; a showing not made or makeable on this record of legislative facts.

## ARGUMENT

## I.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE VIRGINIA'S TRADITIONAL DEFINITION OF MARRIAGE IS CONSTITUTIONAL.

Plaintiffs proceed under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  In doing so they challenge Virginia Constitution article I, § 15-A and Virginia Code §§ 20-45.2 and -45.3.  In tacit recognition that these enactments did not change the pre-existing definition of marriage, they also challenge the definition based on "any Virginia case or common law" source.  (Doc. 26, 18 of 45 n.1).  Although Plaintiffs ask the court to take judicial notice of the content of various newspaper articles, (Doc. 26, 18 of 45 n.2), this is improper.  *See* Fed. R. Civ. P. 56(c)(4); *Evans* v. *Techns. Applications & Servs. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (affirming the striking of portions of an affidavit submitted on summary judgment that were found to be "hearsay, irrelevant, or conclusory").  Certainly such statements are neither "generally known" nor of reasonably indisputable character.  Fed. R. Evid. 201(b).

Plaintiffs argue in their equal protection claim that there can be heightened scrutiny in this Court for sexual orientation despite *Veney* v. *Wyche*, 293 F.3d 726, 731-32 (4th Cir. 2002), and *Thomasson* v. *Perry*, 80 F.3d 915, 927-28 (4th Cir. 1996) (en banc), because of *Lawrence*. (Doc. 26, 24 of 45) ("*See Veney*, 293 F.3d at 731 n.4 (noting that there 'is no fundamental right to engage in homosexual acts generally'); *Thomasson*, 80 F.3d 929 (noting that 'it is legitimate for

Congress to proscribe homosexual acts').").  Plaintiffs' argument fails because "'[i]n *Lawrence*, the Supreme Court plainly held that statutes criminalizing private acts of consensual sodomy between adults,'" (Doc. 26, 24 of 45) (quoting *MacDonald* v. *Moose*, 710 F.3d 154, 163 (4th Cir. 2013)), are irrational, but without employing heightened scrutiny.  *See Lawrence*, 539 U.S. at 578 ("The Texas statute furthers no legitimate state interest . . . "); *id*. at 579-80, 582-85 (O'Connor, J., concurring); *id*. at 594 (Scalia, J., dissenting).

When Plaintiffs claim that "*Windsor* demonstrates that a standard far more exacting than traditional rational basis review applies to laws that discriminate on the basis of sexual orientation," (Doc. 26, 24 of 45), they contradict the analytical framework of the principal case upon which they rely.  *United States* v. *Windsor*, 133 S. Ct. 2675, 2693 (2013) ("The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify" the action (citation omitted)); *see also id*. at 2706 (Scalia and Thomas, JJ., dissenting) (The majority "does not apply strict scrutiny, and its central propositions are taken from rational-basis cases . . .").  It is true that the dissenters thought that certain proffered justifications should have been deemed adequate under the rational basis test, (Doc. 26, 24 of 45); *see Windsor*, 133 S. Ct. at 2696 (Roberts, C.J., dissenting); *id*. at 2707-08 (Scalia and Thomas, JJ., dissenting); *id*. at 2720 (Alito and Thomas, JJ., dissenting), but once the federalism prong of *Windsor* is recognized—an aspect of the case which is fatal to Plaintiffs here—it was internally consistent for the majority to reject proffered reasons of convenience to the national government when that government was acting entirely beyond its traditional competence.  *Id*. at 2691 (Domestic relations are "'a virtually exclusive province of the States.'" (quoting *Sosna* v. *Iowa*, 419 U.S. 393, 404 (1975))).

**A.** **Plaintiffs' Traditional Due Process and Equal Protection Claims under the Fourteenth Amendment Are Foreclosed by *Baker* v. *Nelson*.**

In *Baker* v. *Nelson*, 191 N.W.2d 185 (Minn. 1971), the Minnesota Supreme Court held that Minnesota's law defining marriage as an institution for opposite-sex couples violated neither due process nor equal protection. *Id.* at 187. The United States Supreme Court dismissed the appeal for want of a substantial federal question. *Baker*, 409 U.S. 810. This resolution is dispositive, *Hicks* v. *Miranda*, 422 U.S. 332, 344-45 (1975), including arguments by analogy to *Loving* v. *Virginia*, 388 U.S. 1 (1967), which were made to and rejected by the *Baker* Court itself. Jurisdictional Statement at 3, *Baker*, 409 U.S. 810 (No. 71-1027).

Plaintiffs argue that *Hicks* provides an escape clause for decisions that have "been undermined by subsequent 'doctrinal developments' in the Supreme Court's case law." (Doc. 26, 37-38 of 45) (quoting *Hicks*, 422 U.S. at 344). But the Supreme Court has made clear that deciding when a Supreme Court holding can be departed from because it has been undercut is the exclusive prerogative of the Supreme Court. *State Oil Co.* v. *Khan*, 522 U.S. 3, 20 (1997); *Rodriguez de Quijas* v. *Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *accord Lee-Thomas* v. *Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 250 (4th Cir. 2012). Although Plaintiffs argue that "*Baker* cannot be reconciled" with *Lawrence*, (Doc. 26, 38 of 45), the Federal courts have correctly continued to follow *Baker* after *Lawrence*, *see* (Doc. 44, 17-18 of 45) (citing cases), because *Lawrence* was not a marriage case. *See Lawrence*, 539 U.S. at 578 (cautioning that that decision does "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter"); *id*. at 585 (O'Connor, J., concurring) (agreeing and explaining that "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group").

Plaintiffs argue that at least their equal protection claim should not be barred by *Baker* because the challenge in *Baker* was gender based whereas Plaintiffs are proceeding here on a sexual orientation theory.  (Doc. 26, 38 of 45).  The immediate insuperable problem for that argument is that Virginia has selected gender as the category by which marriage is defined just as in *Baker*.

Next Plaintiffs argue that *Baker* did not consider the *Romer-Windsor* animus theory.  (Doc. 26, 38-39 of 45).  That theory of course is what this case is about and all that it can be about under *Baker*.  That is why this case and others like it have been filed at this time.  Plaintiffs wish to make out a *Windsor* animus case against Virginia.  *See* (Doc. 26, 35-37 of 45).  As demonstrated below, they fail on this record and their motion for summary judgment is therefore due to be denied.

Although Plaintiffs assert that the First and Second Circuits employed heightened scrutiny in their DOMA cases, (Doc. 26, 24 of 45), the Supreme Court did not.  And, of course, both of those circuit courts noted that cases like this one against States are barred by *Baker* v. *Nelson*.  (Doc. 44, 17 of 38); *see Massachusetts* v. *HHS*, 682 F.3d 1, 8 (1st Cir. 2012) ("*Baker* is precedent binding" on whether "the Constitution requires states to permit same-sex marriages" and thus forecloses all arguments that "presume or rest on a constitutional right to same-sex marriage."); *Windsor* v. *United States*, 699 F.3d 169, 178 & n.1 (2d Cir. 2012) (distinguishing *Baker* as not controlling on the ground that challenges to DOMA did not raise "the question in *Baker*: whether same-sex marriage may be constitutionally restricted by the *states*."); *see also Perry*, 671 F.3d at 1082 n.14 (distinguishing *Baker* from the challenge to Proposition 8 on the ground that the latter did not raise "the question of the constitutionality of a state's ban on same-sex marriage.")  Plaintiffs acknowledge, as they must, that the *Windsor* animus test rests on this:

"the law was impermissibly 'motivated by a "bare . . . desire to harm" . . . .'" (Doc. 26, 25 of 45) (quoting *Windsor*, 133 S. Ct. at 2707 (Scalia and Thomas, JJ., dissenting)). But that standard cannot be met on this record.

Certainly that narrow and exacting standard is not logically advanced by the collateral complaint that "the Virginia legislature passed a law permitting adoption agencies to refuse adoptions based on the sexual orientation of the prospective parents. *See* Va. Code § 63.2-1709.3." (Doc. 26, 25 of 45). And, of course, it is a commonly known fact that certain significant providers of adoption services will not provide them otherwise for reasons of conscience. *See* Robin Fretwell Wilson, *The Calculus of Accommodation: Contraception, Abortion, Same-Sex Marriage, and Other Clashes Between Religion and the State*, 53 B.C. L. REV. 1417, 1446-48 (2012) (recounting several prominent instances in which "religious objectors, when left no choice . . . , have often chosen to exit the market [for providing adoption services] rather than violate their religious beliefs" by placing children with same-sex couples). Even states that have recognized same-sex marriage legislatively have adopted conscience clauses. *See id.* at 1439-40, 1509 (Seven "jurisdictions that have recognized same-sex marriage legislatively have all acknowledged the impact of same-sex marriage laws on a wide swath of the public that adheres to a traditional (*i.e.*, heterosexual) view of marriage. . . . A core of protections has emerged for religious organizations and individuals who cannot celebrate or facilitate any marriage--including a same-sex marriage . . . --when doing so would violate their religious convictions." (footnotes omitted)). And two states that have recognized same-sex marriage legislatively, Connecticut and Maryland, have expressly permitted private organizations with conscientious objections to "place children only with heterosexual married couples." *Id.* at 1510.

The narrow and exacting *Windsor* standard is likewise not logically advanced by the complaint that Virginia—like many states—does not have separate statutory protections for sexual orientation. (Doc. 26, 25-26 of 45). The same must be said with respect to the opinion of the Attorney General that "colleges and universities in Virginia" that are operated by the Commonwealth may not have a policy different from the public policy of the General Assembly. (Doc. 26, 26 of 45).

### B. Plaintiffs' Claims to a Heightened Standard of Review Are Foreclosed by the Way the Supreme Court Has Defined Fundamental Rights and by the Fourth Circuit's *En Banc* Decision in *Thomasson* v. *Perry*.

Plaintiffs for whatever reason accept the impossible rhetorical burden of denying "that Plaintiffs are seeking access to a new right of 'same-sex marriage.'" (Doc. 26, 19 of 45). Presumably they do so in an attempt to set up the argument that this case is just like *Loving* and therefore that same-sex marriage is a fundamental right. (Doc. 26, 19 of 45). In the course of this Plaintiffs point out that fertility is not a requirement of marriage. (Doc. 26, 19-20 of 45). But these points do not alter the logical fact that marriage must be redefined if same-sex couples are to enter it or change the historical fact that first marriages have been and are overwhelmingly contracted by those who are likely to be fertile. *See* Casey E. Copen, *et al.*, *First Marriages in the United States:  Data from the 2006-2010 Nat'l Survey of Family Growth*, NATIONAL HEALTH STATISTICS, Report No. 49 at 6 (Mar. 22, 2012), *available at* http://www.cdc.gov/nchs/data/nhsr/nhsr049.pdf (reporting that the probability of first marriage for women by age 40 was 84%).

Surprisingly, Plaintiffs cite *Perry*, 704 F. Supp. 2d at 961, for the proposition that Virginia recognizes what Justice Alito has described as the relatively new "'consent-based' vision of marriage." *See Windsor*, 133 S. Ct. at 2718 (Alito and Thomas, JJ., dissenting). Not only was the district court case in *Perry* not about Virginia, but Virginia's common law understanding of

marriage has been expressed exclusively in terms of what Justice Alito characterizes as the "older view, the 'traditional' or 'conjugal' view." *Id.*; *see Alexander* v. *Kuykendall*, 192 Va. 8, 11, 63 S.E.2d 746, 747-48 (1951) (Those who enter a marriage "are, or should be, motivated by love and affection to form a mutual and voluntary compact to live together as husband and wife, until separated by death, for the purpose of mutual happiness, establishing a family, the continuance of the race, the propagation of children, and the general good of society."). Plaintiffs then argue that denial of same-sex marriage has collateral burdens including the denial of the collateral benefits of marriage. (Doc. 26, 21 of 45).

All of this—Plaintiffs say—makes same-sex marriage a fundamental right the denial of which is subject to strict scrutiny. (Doc. 26, 21 of 45). In so arguing Plaintiffs misapprehend binding Supreme Court doctrine on fundamental rights and on heightened scrutiny.

Fundamental rights are those that "are objectively, 'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington* v. *Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations omitted). As recently as 1996, the traditional definition of marriage as the union of man and woman "had been adopted by every state in our Nation, and every nation in the world." *Windsor*, 133 S. Ct. at 2696 (Roberts, C.J., dissenting). Only in 2003 did Massachusetts become the first State to recognize same-sex marriage. *Goodridge* v. *Dep't of Pub. Health*, 798 N.E.2d 941, 968 (Mass. 2003). As a consequence, same-sex marriage cannot be a fundamental right because it is not deeply rooted in our history and traditions.

Neither the United States Supreme Court nor any federal circuit court of appeals has held that same-sex affinity constitutes a suspect class entitled to heightened scrutiny. Indeed they have said the opposite. *See Massachusetts*, 682 F.3d at 9 (affirming that "extending intermediate

scrutiny to sexual preference classifications is not a step open to us"); *see, e.g.*, *Davis* v. *Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012); *Cook* v. *Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *Witt* v. *Dep't of the Air Force*, 527 F.3d 806, 821 (9th Cir. 2008); *Price-Cornelison* v. *Brooks*, 524 F.3d 1103, 1113-14 (10th Cir. 2008); *Citizens for Equal Prot.* v. *Bruning*, 455 F.3d 859, 866-67 (8th Cir. 2006); *Johnson* v. *Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Lofton* v. *Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Thomasson*, 80 F.3d at 928; *Steffan* v. *Perry*, 41 F.3d 677, 684 n.3 (D.C. Cir. 1994) (en banc); *Ben-Shalom* v. *Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Woodward* v. *United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989); *see also Romer* v. *Evans*, 517 U.S. 620, 631-35 (1996) (applying rational basis scrutiny to classification based on sexual orientation). *Thomasson* is controlling in this Court in any case. Nor does *Lawrence* change this because it was explicitly not a marriage case and eschewed heightened scrutiny.

### C.   Virginia's Traditional Definition of Marriage Does Not Discriminate on the Basis of Sex and No Heightened Scrutiny Attaches on that Account.

Contrary to Plaintiffs' arguments, traditional marriage does not involve "'differential treatment or denial of opportunity' based on a person's sex." (Doc. 26, 29 of 49) (quoting *United States* v. *Virginia*, 518 U.S. 515, 532-33 (1996)). The limitations of the marriage definition apply equally to both sexes. *See, e.g.*, *Hernandez* v. *Robles*, 855 N.E.2d 1, 10-11 (N.Y. 2006) (Traditional marriage "does not put men and women in different classes, and give one class a benefit not given to the other."). Moreover, the Supreme Court in *Baker* rejected that very claim. *See* (Doc. 44, 17 of 38). Even if there were heightened scrutiny, Virginia would satisfy that standard because *Windsor* makes clear that the power of each State to adopt a uniform definition of marriage within its boundaries—including the traditional, conjugal one—is an important governmental interest. *Windsor*, 133 S. Ct. at 2692 ("The dynamics of state government in the

federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other.").

### D.   Plaintiffs Fail to Sustain a Rational Basis Challenge.

When Plaintiffs finally reach their *Windsor* rational basis challenge (Doc. 26, 29 of 45), they fail to discuss the decisive issues.  When same-sex marriages were added to the statutory list of forbidden marriages in 1975, that was done as part of a gender equalizing revision of the Code.  Under the rational basis test, it must be accepted that it was done to avoid inadvertently changing the common law definition of marriage.  That legislation advanced the additional rational goal of disallowing a judge-driven change.  And preserving marriage as the conjugal view understands it is not itself an impermissible purpose.

The common law definition of marriage as between a man and woman, husband and wife,—which the 1975 legislation did not change—in turn is too old to have been the product of bare animus because, as the *Windsor* majority noted, no one would have thought same-sex marriage possible at the time the definition was adopted.  *Windsor*, 133 S. Ct. at 2689 ("Until recent years, many citizens had not even considered the possibility that two persons of the same sex might" desire to marry).

The post-1975 enactments serve rational ends of their own.  The 2006 amendment prevents state court judges from changing the definition under the Virginia Constitution.  The others rationally recognize that if extraterritorial arrangements different from Virginia's were recognized then Virginia could not practically maintain its essentially different definition.  It should also be noted that the portion of DOMA upholding state autonomy in the nonrecognition of foreign arrangements has not been declared unconstitutional.  *Windsor*, 133 S. Ct. at 2682-83.

Thus, a challenge to those aspects of Virginia law would depend upon pleading a constitutional challenge to DOMA after notice to the United States.

### 1.   Plaintiffs' Dismissal of Responsible Procreation and Optimal Child-Rearing as Rational Bases Is Facile and Unavailing.

Under rational basis analysis a State is not required to present evidence of the reasons underlying its legislative choices; it is enough if the legislature might have rationally believed a state of facts to exist.  *See F.C.C.* v. *Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  That traditional marriage promotes responsible procreation and optimal childrearing was once believed by all and is still believed by far too many to be simply dismissed as irrational.

Nor will it do to say that Virginia's definition is over or under inclusive in pursuing its interests in responsible procreation and childrearing inasmuch as the State makes no effort to bar the infertile.  Under rational basis review both over and under inclusion are permitted.  *See City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 441-42, 448 (1985) (noting that differential treatment is appropriate where one class "would threaten legitimate interests . . . in a way that other[s] . . . would not"); *Vance* v. *Bradley*, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both under inclusive and overinclusive, . . . it is nevertheless the rule that . . . 'perfection is by no means required.'" (citation omitted)); *Johnson* v. *Robison*, 415 U.S. 361, 383 (1974) ("When, as in this case, the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory.").  And while "a 'means of pursuing [an] objective' can be 'so woefully under inclusive as to render belief in that purpose a challenge to the credulous,'" (Doc. 26, 31 of 45) (quoting *Republican Party of Minn.* v. *White*, 536 U.S. 765, 780 (2002)), incredulity is unwarranted in the face of the usual arguments in support of conjugal marriage.  Surely opposite-sex couples "have distinguishing

characteristics relevant to interests the State has the authority to implement," namely the capacity to naturally procreate.  *Cleburne*, 473 U.S. at 441.  And the reasons supporting that institution stated in Virginia's common law were necessarily both in good faith and reasonable because they were advanced at a time when the alternative arrangement of same-sex marriage was unthinkable.

No Court can know the consequences of same-sex marriage.  *Windsor*, 133 S. Ct. at 2716 (Alito and Thomas, JJ., dissenting) ("At present, no one – including social scientists, philosophers, and historians – can predict with any certainty what the long-term ramifications of wide-spread acceptance of same-sex marriage will be.  And judges are certainly not equipped to make such an assessment.").  Perhaps if same-sex marriage were to be judicially imposed nothing would change.  But under the rational basis test no legislature is required to believe that that is so because the legislature might reasonably believe this instead:  Throughout history marriage has been contracted by the young and presumptively fertile.  It acts to socialize those persons in a way that contributes to responsible procreation and optimal childrearing.  The conjugal view of marriage encourages a unique (and beneficial) ordering of individual, family, group and societal responsibilities.  Nothing prevents adopting the competing consent-based view through the political process, but a State is rational in preserving the older, conjugal model.

> **2.**     **That which was not held unconstitutional until 2003 under the Massachusetts Constitution cannot be deemed unconstitutional under the United States Constitution under any plausible approach to original intent.**

While it is true that long standing practices may prove to be unconstitutional (Doc. 26, 32-33 of 45), what are the odds that conjugal marriage—one of our most revered institutions throughout our history—has just become unconstitutional?  None under any approach to constitutional adjudication that gives a decent regard to original intent or public meaning of text.

Therein lies a fundamental difference between this case and *Loving*, 388 U.S. 1.  Indeed, *Loving* itself is premised on a conjugal understanding of marriage.  *See id.* at 12 (recognizing "[m]arriage [a]s one of the 'basic civil rights of man,' fundamental to our very existence and survival," and thereby linking its status to procreation (quoting *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942))).

There can be no question that a core purpose of the Fourteenth Amendment was to guarantee to African Americans equal fundamental rights, including the right of marriage.  It is generally agreed that the Fourteenth Amendment was adopted to raise to constitutional status the protections afforded by the Civil Rights Act of 1866.  14 Stat. 27 (1866); *see* Michael W. McConnell, *Originalism & the Desegregation Decisions*, 81 VA. L. REV. 947, 958 & n.29 (1995) ("The principal purpose of Section 1 of the Fourteenth Amendment, as virtually all students of the subject agree, was to provide a firm constitutional basis for the 1866 Act and to ensure that future Congresses would not be able to repeal it.").  And the 1866 Act was understood, including by its critics, as having the effect of "forbid[ding] anti-miscegenation statutes," *id.* at 959 & n.35 (citing statements from the Congressional Globe and President Johnson's veto message), an understanding affirmed in *Loving*.  *See* Steven G. Calabresi & Andrea Matthews, *Originalism & Loving v. Virginia*, 2012 B.Y.U. L. REV. 1393, 1411-12 (2012) (explaining that "since the right to marry is just a subset of the right to make a particular form of contract, the right to marry a person of another race must have been protected by the Civil Rights Act of 1866, even without the Fourteenth Amendment").  On the other hand, no one can suppose that the drafters and ratifiers of the Fourteenth Amendment thought that by incorporating protections against racial discrimination they would empower a court to declare conjugal marriage unconstitutional.

3.      **Plaintiffs' Arguments That Virginia's Marriage Prohibition Cannot Be Justified by Federalism or an Interest in Democratic Self-Governance Are Mistaken.**

Plaintiffs' arguments on this point fly in the teeth of *Windsor*.  133 S. Ct. 2675.  An essential element of the *Windsor* animus analysis was the traditional, plenary authority of the States to provide a single uniform definition of marriage within their boundaries—including same-sex marriage.  Nothing in this formulation invites the conclusion that maintaining a conjugal definition of marriage is unconstitutional.  Instead, the deeper logic of *Windsor* would thereby be rendered incoherent.  *See Id*. at 2696-97 (Roberts, C.J., dissenting) (the logic of the majority cannot be used against a State definition of marriage).

4.      **It Is Historically Impossible That Virginia's Definition of Marriage Was Motivated by a Bare Desire to Harm.**

As demonstrated at length in Janet M. Rainey's Memorandum in Support of Motion for Summary Judgment (Doc. 44), same-sex marriage was added to the statutory list of prohibited marriages in 1975 as a part of recodification involving gender-neutral terms.  Avoiding inadvertently changing the common law definition of marriage is not irrational nor does it constitute a bare design to harm.  Nor did affirming the pre-existing common law change anything to Plaintiffs' injury.  The common law in turn established the conjugal understanding of marriage at a time when no other form was even thought possible.  Hence it is historically impossible for that definition to have been the product of a bare design to harm.  With respect to the post-1975 enactments, it is clear that both traditional defenses of conjugal marriage and political process concerns were in play.  These rational bases cannot be overcome by selective quotation either from House Bill No. 751 or hearsay statements of individuals.  *See Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) ("We will not invalidate a state statute under the Equal Protection Clause merely because some legislators sought to obtain votes for the

18

measure on the basis of" impermissible objectives.); *Star Sci., Inc.* v. *Beales*, 278 F.3d 339, 350 (4th Cir. 2002) (explaining that "even if we were to reject the State's articulated purpose for enacting the statute, we would then need only determine that the legislation has some conceivable purpose that is not prohibited by the Constitution.").  Nor did those enactments alter the pre-existing definition of marriage either.

When Plaintiffs turn to express nonrecognition of foreign same-sex marriages, (Doc. 26, 36-37 of 45), they do not discuss the fact that a state may elect the conjugal model effectively only if it does not recognize extraterritorial marriages based upon the different consent-based model.  Nor do they discuss the pre-existing law that marriages contracted out-of-state to evade in-state limitations have always been deemed voidable—(the apparently acknowledged circumstances of Plaintiffs Schall and Townley).  (Doc. 26, 14-15 of 45, ¶¶ 54, 60).  Finally, to challenge nonrecognition of out-of-state, same-sex marriage in this suit Plaintiffs would need to plead that they are bringing into question the constitutionality of Section 2 of DOMA and give notice to the United States.  28 U.S.C. § 1738C; *see* 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1(a)(1)(A), (a)(2).

### E.      Plaintiffs Are Not Entitled to a Preliminary Injunction.

To obtain any type of preliminary injunction Plaintiffs must make "a clear showing" of likelihood of success on the merits.  *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008).  When Plaintiffs seek a preliminary mandatory injunction they must demonstrate an elevated likelihood of success.  *See Pashby* v. *Delia*, 709 F.3d 307, 319 (4th Cir. 2013).  Where the Supreme Court has not clearly spoken to an issue, and the circuits are not in clear agreement, this standard cannot be satisfied.  *See Lux* v. *Rodrigues*, 131 S. Ct. 5, 7 (2010) (Roberts, C.J., in chambers).  Plaintiffs obviously cannot satisfy that standard here.

Where a pure question of constitutional law is advanced, the remaining equitable factors bearing on the propriety of an injunction tend to collapse into, or become subsumed by, the likelihood of success prong.  *See Centro Tepeyac* v. *Montgomery Cnty.*, 722 F.3d 184, 190-91 (4th Cir. 2013).  This is because while Plaintiffs can claim irreparable harm if they are correct on the merits, they suffer no harm if they are not.  On the other hand, the State suffers irreparable harm as a matter of law when its enactments are declared unconstitutional and enjoined. *Maryland* v. *King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" (quoting *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers))).  And while the public has no interest in enforcing an invalid law, *see Newsom* v. *Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003), it has an interest in upholding valid enactments of its representatives.  *Maryland*, 133 S. Ct. at 3.

## CONCLUSION

For the foregoing reasons, Plaintiffs' alternative motion for summary judgment or a preliminary injunction should be denied.

Respectfully submitted,

_____/s/_____
E. Duncan Getchell, Jr.
Solicitor General of Virginia
(VSB No. 14156)
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
dgetchell@oag.state.va.us
*Counsel for Defendant Rainey*

Kenneth T. Cuccinelli, II
Attorney General of Virginia

Rita W. Beale, VSB #37032
Deputy Attorney General
E-mail:  rbeale@oag.state.va.us

Allyson K. Tysinger, VSB #41982
Senior Assistant Attorney General/Chief
E-mail:  atysinger@oag.state.va.us

Michael H. Brady, VSB #78309
Assistant Solicitor General
E-mail:  mbrady@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of October 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a copy to counsel of record.

_____/s/_____
E. Duncan Getchell, Jr.