**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| TIMOTHY B. BOSTIC, *et al.*,       ) | |
|    Plaintiffs,       ) | |
| ) | |
| v.       ) | Civil Action No. 2:13-cv-00395 |
| ) | |
| JANET M. RAINEY, *et al.*,       ) | |
|    Defendants.       ) | |

**<u>DEFENDANT JANET M. RAINEY'S REPLY MEMORANDUM IN SUPPORT</u>**

Although Plaintiffs begin with *United States* v. *Windsor*, 133 S. Ct. 2675, 2696 (2013), the express statements and underlying logic of the majority opinion make it clear that that case does not provide a rule of decision in favor of Plaintiffs in this case. They likewise make clear that the cases cited in the Introduction do not provide such a rule of decision. Plaintiffs thus deploy these cases for rhetorical effect rather than doctrinal weight. (Doc. 60, 1-3 of 24).

**DEFENDANT'S STATEMENTS OF UNDISPUTED FACTS**

"Plaintiffs dispute [only] the facts set forth in paragraphs 37, 43 and 44 of Defendant Rainey's Statement of Undisputed Legislative Facts."  (Doc. 60, 3 of 24). But they do not do so on the basis of legislative facts material to rational basis review. *See Minnesota* v. *Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (rational basis not judged based on statements of individual legislators); *Clatterbuck* v. *City of Charlottesville*, 708 F.3d 549, 558 (4th Cir. 2013) (or from "a citizen speaking at a city council meeting"); *Star Sci., Inc.* v. *Beales*, 278 F.3d 339, 350 (4th Cir. 2002) ("even if we were to reject the State's articulated purpose for enacting the statute, we would then need only to determine that the legislation has some conceivable purpose that is not prohibited"); *Evans* v. *Techns. Applications & Servs. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (affirming the striking of "hearsay, irrelevant, or conclusory" statements).

## ARGUMENT

According to Plaintiffs, "[t]hose courts that have found *Baker* to be binding with respect to due process or equal protection challenges to state laws prohibiting marriage between individuals of the same sex . . . have simply ignored . . . critical doctrinal developments." (Doc. 60, 5 of 24). But no federal court has felt free to consider a Fourteenth Amendment challenge to a State's marriage laws from *Baker* to *Windsor*. That is why Plaintiffs are legally relegated to proceeding under the narrow and exacting bare animus rational basis standard of *Windsor*. Plaintiffs assert that "*Baker* is not controlling in this case because it cannot be reconciled with the Supreme Court's subsequent decisions in either *Lawrence* or *Windsor*." (Doc. 60, 4 of 24). But both the majority opinion in *Lawrence* and Justice O'Connor's concurrence expressly state that *Lawrence* is neither about marriage nor is it intended to foreshadow a decision about marriage. *Lawrence* v. *Texas*, 539 U.S. 558, 578 (2003); *id*. at 585 (O'Connor, J., concurring). Similarly, the Supreme Court in *Windsor* failed to lift the bar of *Baker* when it said: "This opinion and its holding are confined to . . . lawful marriages" under state law. *Windsor*, 133 S. Ct. at 2696. Furthermore, and decisively, Plaintiffs' theory that a federal court can decide when to disregard a decision of the Supreme Court which is directly on point is itself mistaken. Both the Supreme Court and the Fourth Circuit have made clear that the prerogative of declaring a Supreme Court holding *on point* undercut and inoperative is solely that of the Supreme Court itself. *See State Oil Co.* v. *Khan*, 522 U.S. 3, 20 (1997) (Only the United States Supreme Court has the "prerogative . . . to overrule one of its precedents."); *Rodriguez de Quijas* v. *Shearson/Am. Express*, *Inc*., 490 U.S. 477, 484 (1989) (same where "a precedent of this Court has direct application in a case," even if it "appears to rest on reasons rejected in some other line of decisions"); *Lee-Thomas* v. *Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 250 (4th Cir. 2012) (same citing *Rodriguez de Quijas*, 490 U.S. at 484).

2

Plaintiffs can lay claim to no fundamental right—one that is, "objectively, 'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington* v. *Glucksberg*, 521 U.S. 702, 720-21 (1997). And neither the United States Supreme Court nor any federal circuit court of appeals has applied heightened scrutiny to a class defined by sexual orientation under the Fourteenth Amendment. Instead they have said the opposite. *See, e.g.*, *Citizens for Equal Prot.* v. *Bruning*, 455 F.3d 859, 866-67 (8th Cir. 2006) (affirming that sexual orientation is not a suspect classification and so applying rational basis review to a law defining marriage as between a man and a woman); *see also Massachusetts* v. *H.H.S.*, 682 F.3d 1, 9 (1st Cir. 2012) (affirming that "extending intermediate scrutiny to sexual preference classifications is not a step open to us" under Fifth Amendment); *but see also Windsor* v. *United States*, 699 F.3d 169, 179, 181-85 (2d Cir. 2012) (applying a form of heightened scrutiny to DOMA under Fifth Amendment not adopted by Supreme Court).

When Plaintiffs say that they "are not seeking recognition of a new fundamental right to 'same-sex marriage,'" (Doc. 60, 7 of 24), they are flying in the face of *Windsor*—the case that provides their only substantive hope. The majority there recognized that same-sex marriage was unthinkable until very recently. *Windsor*, 133 S. Ct. at 2689. And Justice Alito simply states the obvious when he notes that what Plaintiffs seek "is not the protection of a deeply rooted right but the recognition of a very new right . . . ." *Id.* at 2715 (Alito and Thomas, JJ., dissenting). The cases cited by Plaintiffs for the proposition that marriage is a fundamental right speak in the context of traditional, conjugal marriage. (Doc. 60, 5-9 of 24). That fact is only emphasized by Plaintiffs' omission of procreation from the definition of marriage found in *Alexander* v. *Kuykendall*, 192 Va. 8, 11, 63 S.E.2d 746, 747-48 (1951); (Doc. 60, 7 of 24). Same-sex

marriage—on the other hand—is foreclosed unless Plaintiffs can meet the narrow and exacting test of bare animus, something they fail to do on this record.

When Plaintiffs appeal to a *Loving* v. *Virginia* analogy, they argue that long standing practices may prove to be unconstitutional. (Doc. 60, 8-9 of 24). That is true but what are the odds that conjugal marriage—one of our most revered institutions throughout our history—has just become unconstitutional? None under any approach to constitutional adjudication that gives a decent regard to original intent or public meaning of text.

Therein lies a fundamental difference between this case and *Loving* v. *Virginia*, 388 U.S. 1 (1967). There can be no question that a core purpose of the Fourteenth Amendment was to guarantee to African Americans equal fundamental rights, including the right of marriage. *See* Michael W. McConnell, *Originalism & the Desegregation Decisions*, 81 VA. L. REV. 947, 958 & n.29 (1995); Steven G. Calabresi & Andrea Matthews, *Originalism &* Loving v. Virginia, 2012 B.Y.U. L. REV. 1393, 1411-12 (2012). And, *Loving* itself is premised on a conjugal understanding of marriage. *See Loving*, 388 U.S. at 12 (recognizing "[m]arriage [a]s one of the 'basic civil rights of man,' fundamental to our very existence and survival," and thereby linking its status to procreation (quoting *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942))). Furthermore, the Supreme Court itself rejected the *Loving* analogy in *Baker*. Petitioners' jurisdictional statement cited fourteen Supreme Court cases—none more than *Loving*—which was cited nine times. Br. of Pet'r, *Baker*, 409 U.S. 810. So when the Supreme Court, including four justices from the *Loving* Court, dismissed *Baker* "for want of a substantial federal question," the rejection of the *Loving* analogy was manifest. *Baker* v. *Nelson*, 409 U.S. 810 (1972).

When Plaintiffs claim that Virginia's law "is also subject to heightened scrutiny under the Equal Protection Clause because it discriminates against Plaintiffs on the basis of sexual

4

orientation," (Doc. 60, 9 of 24), the proposition is simply counterfactual. Marriage is defined in terms of a man and woman, husband and wife, and not in terms of sexual orientation. Plaintiffs also claim that heightened scrutiny should apply because *Windsor* supposedly "applied a form of heightened scrutiny." (Doc. 60, 9 of 24). This, however, contradicts the analytical framework of *Windsor*. 133 S. Ct. at 2693 ("The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify" the action. (citation omitted)); *see id*. at 2706 (Scalia and Thomas, JJ., dissenting) (The majority "does not apply strict scrutiny, and its central propositions are taken from rational-basis cases . . . ."). It is true that the dissenters thought that certain proffered justifications should have been deemed adequate under the rational basis test, (Doc. 60, 9 of 24); *see Windsor*, 133 S. Ct. at 2696 (Roberts, C.J., dissenting); *id*. at 2707-08 (Scalia and Thomas, JJ., dissenting); *id*. at 2720 (Alito and Thomas, JJ., dissenting), but once the federalism prong of *Windsor* is recognized—an aspect of the case which is fatal to Plaintiffs here—it was internally consistent for the majority to reject proffered reasons of convenience to the national government when that government was acting entirely beyond its traditional competence. *Id*. at 2691 (Domestic relations are "'a virtually exclusive province of the States.'"). And while it is true that some lower court DOMA cases employed heightened review, (Doc. 60, 9 of 24) (citing *Golinski* v. *U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 990 (N.D. Cal. 2012)), the Supreme Court failed to follow this lead. And, of course, *Windsor* and the courts of appeals have made clear that the issues under DOMA were distinct from a State's power to define marriage.

Plaintiffs argue that *Thomasson* v. *Perry*, 80 F.3d 915 (4th Cir. 1996) (en banc), may be disregarded on the question of heightened scrutiny because of *Lawrence* and because *Thomasson* was decided under the war powers. (Doc. 60, 10 of 24). Neither argument goes to heightened

scrutiny. Not *Lawrence* because it did not apply heightened scrutiny and not the war powers because *Thomasson* performed a traditional and independent heightened scrutiny analysis, saying "[t]he searching review that is the hallmark of strict scrutiny is appropriate only in limited cases, where the statute classifies along inherently suspect lines or burdens the exercise of a fundamental right." 80 F.3d at 927-28. Neither is true here and *Thomasson* remains binding on this Court.

Rainey disputes the existence of a simple four-part test for applying heightened scrutiny and disputes "that gay men and lesbians" satisfy those criteria as heretofore applied. (Doc. 60, 10-11 of 24). The Supreme Court has recognized no new suspect or quasi-suspect class in forty years and has cautioned lower courts to be "very reluctant" to recognize them. *See City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 445-46 (1985) (noting that if one "large and amorphous class . . . were deemed quasi-suspect . . . , it would be difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable [characteristics] setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large. . . . We are reluctant to set out on that course, and we decline to do so."); *accord Thomasson*, 80 F.3d at 928. The social contribution prong of Plaintiffs' argument is not a good fit here because the ability at issue is the procreative capacity of opposite-sex unions. Thus it adds nothing to deciding the contest between the competing views of marriage. *See Cleburne*, 473 U.S. at 441-42 ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued."). And the adoption of such an antimajoritarian course makes little sense in light of the

political power of the group and its allies in bringing about redefinition of the institution of marriage. *Id.* at 445 ("Any minority can be said to be powerless to assert direct control over the legislature"; the issue is whether they "have no ability to attract the attention of the lawmakers."). Under that standard, this political power extends to the Commonwealth, where same-sex marriage is the subject of ongoing political debate. Moreover, an immutability analysis brings little additional clarity. Both sides appeal to the immutable. "Furthermore, the complexities involved merely in defining the [applicable group] term . . . would prohibit a determination of suspect classification." *Holloway* v. *Arthur Anderson & Co.*, 566 F.2d 659, 663 (9th Cir. 1977) (declining to recognize transsexuals as a suspect class). Even if heightened scrutiny were applicable, Virginia would satisfy that standard because *Windsor* makes clear that the power of each State to adopt a uniform definition of marriage within its boundaries—including the traditional, conjugal one—is an important governmental interest. *Windsor*, 133 S. Ct. at 2692 ("The dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other."); *accord Lofton* v. *Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 819 (11th Cir. 2004) ("It is hard to conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society.").

Plaintiffs' final argument for heightened scrutiny is based on sex discrimination, citing *United States* v. *Virginia*, 518 U.S. 515, 533 (1996), and *Cleburne*, 473 U.S. at 440. (Doc. 60, 11-12 of 24). Heightened scrutiny on account of sex is not triggered simply by recognition of the existence of men and women. It is instead addressed to "official action that closes a door or

denies opportunity to women (or to men)." *Virginia*, 518 U.S. at 532. Absent "denigration of the members of either sex or . . . artificial constraints on an individual's opportunity," there is no heightened scrutiny because "'[t]he two sexes are not fungible.'" *Id*. at 533. And when it comes to marriage, the limitations of the definition apply equally to both sexes. *See, e.g.*, *Hernandez* v. *Robles*, 855 N.E.2d 1, 10-11 (N.Y. 2006) (Traditional marriage "does not put men and women in different classes, and give one class a benefit not given to the other.").

When Plaintiffs reach the rational basis test, (Doc. 60, 17-19 of 24), they admit for the sake of argument that encouraging responsible procreation may have been a rational basis "in the first place." (Doc. 60, 13 of 24). But, they say, "it does not provide any remotely plausible basis for *excluding* gay men and lesbians from that institution." (*Id.*). Of course, under rational basis analysis, if the inclusion of only certain persons has a rational basis, the noninclusion of others is not invidious "exclu[sion]"—particularly for those who were never included.

It will not do to say that because the State makes no effort to bar the infertile, Virginia's definition is over or under inclusive. (Doc. 60, 13-14 of 24). Under rational basis review both over and under inclusion are permitted. *See Cleburne*, 473 U.S. at 441-42, 448 (Differential treatment is appropriate where one class can produce circumstances that others would not.); *Vance* v. *Bradley*, 440 U.S. 93, 108 (1979) ("'[P]erfection is by no means required.'"); *Johnson* v. *Robison*, 415 U.S. 361, 383 (1974) (Where "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not," classification is rational). Although Plaintiffs suggest that the stated bases should be regarded as pretextual, (Doc. 60, 14 of 24), such incredulity is wholly unwarranted. Clearly opposite-sex couples "have distinguishing characteristics relevant to interests the State has the authority to implement," namely the capacity to naturally procreate. *Cleburne*, 473 U.S. at 441. And the reasons supporting conjugal marriage

as stated in Virginia's common law were necessarily both in good faith and reasonable because they were advanced at a time when the alternative arrangement of same-sex marriage was unthinkable.

Plaintiffs complain of a lack of "evidence to suggest that prohibiting marriages between individuals of the same sex will increase or otherwise promote responsible procreation among opposite-sex couples." (Doc. 60, 14 of 24). Under rational basis analysis, a State is not required to present evidence of the reasons underlying its legislative choices; it is enough if the legislature might have rationally believed a set of facts to exist. *See F.C.C.* v. *Beach Commc'ns*, *Inc.*, 508 U.S. 307, 313, 315 (1993). That traditional marriage promotes responsible procreation and optimal childrearing within society as a whole was once believed by all and is still believed by far too many to be simply dismissed as irrational. And the proper legal inquiry is not whether same-sex marriage interferes with the purposes advanced by the traditional classification but whether it advances them. Under the rational basis test, a Court must uphold the law if a reasonable legislator could believe that affirming the conjugal view of marriage may lead to superior outcomes to those produced by adopting the consent view of marriage. Certainly there are those who report data in support of the proposition that adhering to traditional views of marriage leads to better outcomes for couples, W. Bradford Wilcox & Steven L. Nock, *What's Love Got to Do With It? Ideology, Equity, Gender and Women's Marital Happiness*, 84 SOCIAL FORCES 1321 (2006), http://www.virginia.edu./sociology/peopleofsociology /wilcoxpapers/Wilcox%20Nock%20Marriage.pdf, and society as a whole. *See* (Doc. 64-1). And of course, under the rational basis test, the factual pronouncements of courts in unrelated litigation do not control. (Doc. 60, 14 of 24) (citing unreviewed "findings" by Northern District of California).

No Court can know the consequences of judicially imposing same-sex marriage. *Windsor*, 133 S. Ct. at 2716 (Alito and Thomas, JJ., dissenting). And under the rational basis test no legislature is required to believe that all change would be positive because the legislature might reasonably believe this instead: Throughout history marriage has been contracted by the young and presumptively fertile. It acts to socialize those persons in a way that contributes to responsible procreation and optimal childrearing. The conjugal view of marriage encourages a unique (and beneficial) ordering of individual, family, group and societal responsibilities. Nothing prevents adopting the competing consent view through the political process, but a State is rational in preserving the older, conjugal model.

Arguments from the collateral economic effects of a classification are not significant under rational basis review because all classifications have collateral effects. (Doc. 60, 16 of 24). The collateral effects in *Windsor* had constitutional significance only because of an antecedent finding of a bare intent to harm. No such finding is possible on this record. Moreover, that Virginia has never altered its definition of marriage is constitutionally significant under *Windsor* because that makes it historically impossible that it was adopted with the prohibited intent; for the majority in *Windsor* recognized that no alternative was thought possible until quite recently. And if—as *Windsor* strongly implies—States have the authority to choose which view to sanction, enactments simply affirming an otherwise permissible definition cannot be unconstitutional.

When Plaintiffs predict that the Supreme Court will strike down Section 2 of DOMA, 28 U.S.C. § 1738C, (Doc. 60, 17 of 24), they do nothing to advance their attack on Virginia's nonrecognition of nonconforming out-of-state marriages. Section 2 is presumptively constitutional. Indeed it is supported by Section 5 of the Fourteenth Amendment. Plaintiffs

cannot fully engage all bases supporting Virginia's law unless and until they amend their complaint to challenge Section 2 of DOMA—serving the required notice on the United States.

Amending the Virginia Constitution to prevent a judicial misconstruction was a rational political act not an improper avoidance of judicial review. (Doc. 60, 17-18 of 24); *see Alden* v. *Maine*, 527 U.S. 706, 715-724 (1999) (recounting the outraged response to *Chisholm* v. *Georgia*, 2 U.S. (Dall.) 419 (1793), which resulted in the adoption of the Eleventh Amendment).

Plaintiffs end their merits argument by begging the question—claiming disparagement because of a supposed absence of a rational basis for conjugal marriage. But the cases rejecting a Fourteenth Amendment attack on traditional marriage are overwhelming in number. An analysis this dominant in our legal system cannot have just become simply irrational. That is why the majority opinion in *Windsor* is so cabined and nuanced—any assertion that traditional marriage is an irrational institution would itself be irrational.

Plaintiffs lack standing to challenge Virginia's civil union laws and their severability argument, (Doc. 60, 20 n.2 of 24), is wholly alien to standing analysis. *See also* Va. Code § 1-243 (severability).

## CONCLUSION

For all of the reasons stated in the record, summary judgment should be granted to Janet M. Rainey in her official capacity.

Respectfully submitted,

/s/
E. Duncan Getchell, Jr.
Solicitor General of Virginia
(VSB No. 14156)
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile

                dgetchell@oag.state.va.us
                *Counsel for Defendant Rainey*

Kenneth T. Cuccinelli, II
Attorney General of Virginia

Norman A. Thomas, VSB #20632
Senior Appellate Counsel
E-mail:  nthomas@oag.state.va.us

Rita W. Beale, VSB #37032
Deputy Attorney General
E-mail:  rbeale@oag.state.va.us

Allyson K. Tysinger, VSB #41982
Senior Assistant Attorney General/Chief
E-mail:  atysinger@oag.state.va.us

Michael H. Brady, VSB #78309
Assistant Solicitor General
E-mail:  mbrady@oag.state.va.us

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a copy to counsel of record.

/s/
E. Duncan Getchell, Jr.
