UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TIMOTHY B. BOSTIC, TONY C. LONDON,
CAROL SCHALL, and MARY TOWNLEY,

Plaintiffs,

v.                                                          Civil No. 2:13cv395

JANET M. RAINEY, in her official capacity
as State Registrar of Vital Records, and
GEORGE E. SCHAEFER, III, in his official
capacity as the Clerk of Court for Norfolk
Circuit Court,

Defendants;

and

MICHÈLE B. McQUIGG, in her official capacity
as Prince William County Clerk of Circuit Court,

Intervenor-Defendant.

*We made a commitment to each other in our love and lives, and now had the legal commitment, called marriage, to match. Isn't that what marriage is? . . . I have lived long enough now to see big changes. The older generation's fears and prejudices have given way, and today's young people realize that if someone loves someone they have a right to marry. Surrounded as I am now by wonderful children and grandchildren, not a day goes by that I don't think of Richard and our love, our right to marry, and how much it meant to me to have that freedom to marry the person precious to me, even if others thought he was the "wrong kind of person" for me to marry. I believe all Americans, no matter their race, no matter their sex, no matter their sexual orientation, should have that same freedom to marry. Government has no business imposing some people's religious beliefs over others. . . . I support the freedom to marry for all. That's what Loving, and loving, are all about.*

— Mildred Loving, "Loving for All"[1]

---

[1] Mildred Loving, Loving for All, Public Statement on the 40th Anniversary of *Loving v. Virginia* (June 12, 2007).

## OPINION AND ORDER

A spirited and controversial debate is underway regarding who may enjoy the right to marry in the United States of America. America has pursued a journey to make and keep our citizens free. This journey has never been easy, and at times has been painful and poignant. The ultimate exercise of our freedom is choice. Our Constitution declares that "all men" are created equal. Surely this means all of us. While ever-vigilant for the wisdom that can come from the voices of our voting public, our courts have never long tolerated the perpetuation of laws rooted in unlawful prejudice. One of the judiciary's noblest endeavors is to scrutinize laws that emerge from such roots.

Before this Court are challenges to Virginia's legislated prohibition on same-sex marriage. Plaintiffs assert that the restriction on their freedom to choose to marry the person they love infringes on the rights to due process and equal protection guaranteed to them under the Fourteenth Amendment of the United States Constitution. These challenges are well-taken.

## I.  BACKGROUND

### A. PROCEDURAL HISTORY

Plaintiffs Timothy B. Bostic and Tony C. London are two men who have been unable to obtain a marriage license to marry each other in Virginia because of Virginia's Marriage Laws.[2] On July 18, 2013, Mr. Bostic and Mr. London filed a Complaint pursuant to 42 U.S.C. § 1983 against former Governor Robert F. McDonnell, former Attorney General Kenneth T. Cuccinelli, and George E. Schaefer III in his official capacity as the Clerk of Court for Norfolk Circuit Court (ECF No. 1). This Complaint sought declaratory and injunctive relief regarding the treatment of same-sex marriages in the Commonwealth of Virginia under the Virginia Constitution and the

---

[2] Unless otherwise noted, "Virginia's Marriage Laws" refer to Article I, Section 15-A of the Virginia Constitution, the statutory provisions cited herein, and any other law relating to marriage within the Commonwealth of Virginia.

Virginia Code. The Complaint also asked this Court to find Article I, Section 15-A of the Virginia Constitution and Sections 20-45.2, 20-45.3 of the Virginia Code unconstitutional under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

On September 3, 2013, Mr. Bostic and Mr. London filed an Amended Complaint dismissing the former Governor and the former Attorney General as defendants.[3] The Amended Complaint added two plaintiffs, Carol Schall and Mary Townley. Plaintiffs Mr. Bostic, Mr. London, Ms. Schall and Ms. Townley are herein collectively referred to as "Plaintiffs." One new defendant was added in the Amended Complaint: Ms. Janet Rainey, in her official capacity as State Registrar of Vital Records. Ms. Rainey and Mr. Schaefer are collectively referred to as "Defendants."

The parties advanced cross motions seeking summary judgment (ECF Nos. 25, 38, 40), and Plaintiffs also filed a Motion for Preliminary Injunction (ECF No. 27). These motions were the subject of a hearing conducted before this Court on February 4, 2014.

Two motions for leave to file *amici curiae* briefs in support of Defendants' motions were filed and granted. Additionally, Ms. Michèle McQuigg ("Intervenor-Defendant") moved to intervene as a defendant in her official capacity as Prince William County Clerk of Circuit Court, and this was granted in part on January 21, 2014.

On January 23, 2014, Defendant Rainey, in conjunction with the Office of the Attorney General, submitted a formal change in position, and relinquished her prior defense of Virginia's Marriage Laws. Intervenor-Defendant was granted leave to adopt Ms. Rainey's prior motion and briefs in support of that motion.

---

[3] After those parties were dismissed as defendants, then-pending motions to dismiss from those parties were dismissed as moot.

Accordingly, for the purposes of analyzing the arguments presented in this matter, the Plaintiffs and Ms. Rainey are hereinafter referred to as the "Opponents" of Virginia's Marriage Laws, and Defendant Schaefer, Intervenor-Defendant, and the *amici* are hereinafter referred to as the "Proponents" of Virginia's Marriage Laws. Where necessary for the following analysis, this Opinion and Order will identify the individual parties and their arguments.

B. FACTS

   1. Plaintiffs Timothy B. Bostic and Tony London

Plaintiffs Timothy B. Bostic and Tony C. London live in Norfolk, Virginia, where they own a shared home. Mr. Bostic is an Assistant Professor of English Education in the Department of English at Old Dominion University in Norfolk, Virginia. He teaches English Education to undergraduate students.

Mr. London is a veteran of the United States Navy. He also worked as a real estate agent in Virginia for sixteen years.

Mr. Bostic and Mr. London have enjoyed a long-term, committed relationship with each other since 1989, and have lived together continuously in Virginia for over twenty years. They desire to marry each other, publicly commit themselves to one another, participate in a State-sanctioned celebration of their relationship, and undertake the solemn rights and responsibilities that Virginia's Marriage Laws confer presently upon other individuals who marry.

On July 1, 2013, Mr. Bostic and Mr. London applied for a marriage license from the Clerk for the Circuit Court for the City of Norfolk. They completed the application for a marriage license and affirmed that they are over eighteen years of age and are unrelated. Mr. Bostic and Mr. London meet all of the legal requirements for marriage in Virginia except for the

fact that they are the same gender. Va. Code §§ 20-38.1, 20-45.1 (2014). Their application for a marriage license was denied by the Clerk of the Circuit Court for the City of Norfolk.

2. Plaintiffs Carol Shall and Mary Townley

Plaintiffs Carol Schall and Mary Townley live in Chesterfield County, Virginia, with their fifteen-year-old daughter, E. S.-T. Ms. Schall is an Assistant Professor in the School of Education at Virginia Commonwealth University ("VCU") in Richmond, Virginia. She specializes in research on teaching autistic children.

Ms. Townley is the Supervisor of Transition at Health Diagnostic Laboratory, Inc. ("HDL"). She trains individuals with significant disabilities so that they may work at HDL.

Ms. Townley and Ms. Schall have enjoyed a committed relationship since 1985. They have lived together continuously in Virginia for almost thirty years.

In 2008, Ms. Schall and Ms. Townley were legally married in California. They obtained a marriage license in California because the laws of Virginia did not permit them to do so in their home state.

Ms. Schall and Ms. Townley meet the legal requirements to have their marriage recognized in Virginia, except that they are the same gender. *See id.* §§ 20-38.1, 20-45.2, 20-45.3 (2014). Because the Commonwealth will not recognize their legal California marriage, Ms. Schall and Ms. Townley face legal and practical challenges that do not burden other married couples in Virginia.

Ms. Townley gave birth to the couple's daughter, E. S.-T., in 1998. During her pregnancy, she was admitted to the emergency room at VCU's Medical Center due to complications that left her unable to speak. Ms. Schall was denied access to Ms. Townley, and

could obtain no information about Ms. Townley's condition, for several hours because she is not recognized as Ms. Townley's spouse under Virginia law. *See id.* § 54.1-2986 (2014).

Since E. S.-T.'s birth, Ms. Schall has yearned to adopt her. Virginia law does not permit second-parent adoption unless the parents are married. Because Ms. Schall is not considered to be Ms. Townley's spouse, Ms. Schall is deprived of the opportunity and privilege of doing so. *Id.* §§ 63.2-1201, 63.2-1202 (2014).

Ms. Schall and Ms. Townley also incurred significant expenses to retain an estate planning attorney for necessary assistance in petitioning a court to grant Ms. Schall full joint legal and physical custody of E. S.-T. Although their petition was granted, Ms. Schall remains unable to legally adopt E. S.-T.

Despite being deprived of the opportunity to participate in a legal adoption of her daughter, Ms. Schall is a loving parent to E. S.-T., just as Ms. Townley is. The family lives together in one household, and both parents provide E. S.-T. with love, support, discipline, protection and structure.

Ms. Schall and Ms. Townley cannot obtain a Virginia marriage license or birth certificate for their daughter listing them both as her parents. *Id.* §§ 20-45.2, 32.1-261 (2014).

In April 2012, Ms. Schall and Ms. Townley sought to renew E. S.-T.'s passport, a process that requests the consent of both parents. When Ms. Schall and Ms. Townley presented the passport renewal forms on behalf of their daughter, a civil servant at a United States Post Office in Virginia told Ms. Schall that "You're nobody, you don't matter." Schall Decl. para. 17, ECF No. 26-3; Townley Decl. para. 12, ECF No. 26-4.

After E. S.-T. was born, Ms. Townley had to return to work in part because her own health insurance was expiring and she could not obtain coverage under Ms. Schall's insurance

plan. Until February 2013, neither Ms. Schall nor Ms. Townley could obtain insurance coverage for each other under their respective employer-provided health insurance plans.

In February 2013, Ms. Townley obtained health insurance coverage under her employer-provided plan for Ms. Schall. She must pay state income taxes on the benefit because she and Ms. Schall are not recognized as married under Virginia's Marriage Laws.

Ms. Schall and Ms. Townley were ineligible for protections under federal laws governing family medical leave when their daughter was born and when one of their parents passed away. 29 U.S.C. § 2612 (2014). If the Commonwealth of Virginia recognized Ms. Schall's and Ms. Townley's legal marriage and permitted both to be listed on their daughter's birth certificate, their daughter could inherit the estate of both parents in the event of their death, and could avoid tax penalties on any inheritance from Ms. Schall's estate. Va. Code § 64.2-309 (2014).

Under Virginia's Marriage Laws, agreements between Ms. Schall and Ms. Townley concerning custody, care, or financial support for their daughter could be declared void and unenforceable. *Id.* § 20-45.2. Because the Commonwealth does not recognize their legal marriage, benefits of Virginia's Marriage Laws that promote the integrity of families are denied to Ms. Schall, Ms. Townley and their child.[4]

3. Virginia's Marriage Laws

The laws at issue here, referred herein as Virginia's Marriage Laws, include two statutory prohibitions on same-sex unions, and an amendment to the Virginia Constitution. Specifically, Plaintiffs seek relief from the imposition of Article I, § 15-A, of the Virginia Constitution and Sections 20-45.2 and 20-45.3 of the Virginia Code.

---

[4] These benefits include, but are not limited to, protections regarding how and when a marriage may be allowed to dissolve, which acknowledge the importance of families and children in Virginia. Va. Code § 20-91 (2014).

Plaintiffs also seek relief from the imposition of any "Virginia law that bars same-sex marriage or prohibits the State's recognition of otherwise-lawful same-sex marriages from other jurisdictions." *See* Am. Compl., Prayer for Relief, paras. 1–2, ECF No. 18. Plaintiffs also request that their constitutional challenge extend to any Virginia case or common law upon which the Proponents or other parties might rely in attempts to withhold marriage from same-sex couples or deny recognition to the legal marriage of same-sex couples.

There is little dispute that these laws were rooted in principles embodied by men of Christian faith. By 1819, Section 6 of the Code of Virginia also made it lawful for all religious persuasions and denominations to use their own regulations to solemnize marriage. 1 Thomas Ritchie, The Revised Code of the Laws of Virginia 396 (1819). However, although marriage laws in Virginia are endowed with this faith-enriched heritage, the laws have nevertheless evolved into a civil and secular institution sanctioned by the Commonwealth of Virginia, with protections and benefits extended to portions of Virginia's citizens. *See Womack v. Tankersley,* 78 Va. 242, 243 (1883).

The Virginia Code in 1819 declared that every license for marriage "shall be issued by the clerk of the court of that county or corporation . . . ." *Id.* at 398. The authority to conduct marriages was then bestowed upon civil servants. *Id.* at 396–97 ("[T]here is no ordained minister of the gospel . . . within this Commonwealth, authorised to celebrate the rites of matrimony. . . . [I]t shall be and may be lawful for the courts . . . to appoint two persons of each of the said counties . . . who, by virtue of this act, shall be authorised to celebrate the rites of marriage, in the counties wherein they respectively reside.").[5]

---

[5] The extension of those protections and benefits has sometimes occurred after anguish and the unavoidable intervention of federal jurisprudence. *See, e.g., Loving v. Virginia,* 388 U.S. 1 (1967) (balancing the state's right to regulate marriage against the individual's rights to equal protection and due process under the law).

In 1997, Virginia law limited the institution of civil marriage to a union between a man and a woman. Va. Code § 20-45.2. The Virginia legislature amended the Code to provide that "a marriage between persons of the same sex is prohibited." *Id.* "Any marriage entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created by such marriage shall be void and unenforceable." *Id.*

In 2004, following successful challenges to state prohibitions against same-sex marriage in other states, Virginia's General Assembly, through Joint Resolution No. 91 and House Joint Resolution No. 187, proposed an amendment to the Virginia Constitution. *See* S.J. Res. 91, Reg. Sess. (Va. 2004) (enacted) (citing "challenges to state laws have been successfully brought in Hawaii, Alaska, Vermont, and most recently in Massachusetts on the grounds that the legislature does not have the right to deny the benefits of marriage to same-sex couples and the state must guarantee the same protections and benefits to same-sex couples as it does to opposite-sex couples absent a constitutional amendment" as a basis for amending the Virginia Constitution).

On November 7, 2006, a majority of Virginia voters ratified a constitutional amendment (the "Marshall/Newman Amendment"), which was implemented as Article I, Section 15-A of the Virginia Constitution. The Marshall/Newman Amendment provides:

> That only a union between one man and one woman may be a marriage valid in or recognized by this Commonwealth and its political subdivisions.
>
> This Commonwealth and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage. Nor shall this Commonwealth or its political subdivisions create or recognize another union, partnership, or other legal status to which is assigned the rights, benefits, obligations, qualities, or effects of marriage.

Va. Const. art. I, § 15-A.

The Virginia Legislature also adopted the Affirmation of Marriage Act in 2004. This provides:

> A civil union, partnership contract or other arrangement between persons of the same sex purporting to bestow the privileges or obligations of marriage is prohibited. Any such civil union, partnership contract or other arrangement entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created thereby shall be void and unenforceable.

Va. Code § 20-45.3.

## II.  STANDARDS OF LAW

### A. SUMMARY JUDGMENT

The Proponents and Opponents of Virginia's Marriage Laws have moved for summary judgment on the constitutional challenges to the laws. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be considered by a court in its determination. *Id.* at 248.

After a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

At that point, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

In doing so, the Court must construe the facts in the light most favorable to the non-moving party, and may not make credibility determinations or weigh the evidence. *Id.* at 255. However, a court need not adopt a version of events that is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). If there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," the motion for summary judgment must be denied. *Id.* at 249.

B. PRELIMINARY INJUNCTION

Plaintiffs also request a preliminary injunction. A plaintiff requesting the extraordinary remedy of a preliminary injunction must establish a likelihood of success on the merits, that the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### III. ANALYSIS

The Opponents contend that that Virginia's Marriage Laws violate Plaintiffs' due process and equal protection rights under the United States Constitution as a matter of law. They raise facial constitutional challenges to the provision of Virginia's Constitution, and to several Virginia statutes, that prohibit same-sex marriage.

Alternatively, Plaintiffs argue that if the Court declines to grant summary judgment, it should issue a preliminary injunction compelling Defendants to cease enforcement of Virginia's Marriage Laws as against these Plaintiffs pending a final judgment.

The Proponents oppose these motions, and defend the constitutionality of Virginia's Marriage Laws. They maintain that the Commonwealth has the right to define marriage according to the judgment of its citizens.

## A. PRELIMINARY CHALLENGES

Before turning to the more substantive arguments, the Court first addresses two preliminary challenges advanced by Defendant Schaefer and Intervenor-Defendant McQuigg. The first challenge asks whether Plaintiffs have standing to maintain this action. The second challenge pertains to whether sufficient doctrinal developments regarding the questions presented have evolved to overcome the possibly precedential impact of the Supreme Court's 1972 summary dismissal of a constitutional challenge to a state's same-sex marriage laws.

### 1. Plaintiffs have standing

Defendant Schaefer argues that Plaintiffs Bostic and London lack standing to bring this suit against him because they failed to submit an application to obtain a marriage license. Therefore, Defendant Schaefer contends, Plaintiffs Bostic and London suffered no injury for the purposes of standing as provided by Article III of the United States Constitution. Br. Supp. Def. Schaefer's Mot. Summ. J. 6, ECF No. 41.

Defendant Schaefer also argues that Ms. Schall and Ms. Townley "have not alleged any injury created by[,] or tangentially related to[,] any act or omission by him." *Id.* at 7. Defendant Schaefer argues that the relief requested would not correct the harms alleged by Plaintiffs Schall and Townley. *Id.* Defendant Schaeffer contends that Ms. Schall and Ms. Townley have sought

no recognition of their California marriage through him, and have not attempted to obtain a marriage license from him in Norfolk. *Id.* Defendant Schaefer contends that even if he were ordered to issue marriage licenses to same-sex couples, Ms. Schall and Ms. Townley would be unaffected because they are already married under the laws of California. *Id.*

A plaintiff must meet three elements to establish standing. First, a plaintiff must have suffered an "injury in fact" which is "concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, a plaintiff must establish "a causal connection between the injury and the conduct complained of." *Id.* "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

There is no dispute that Plaintiffs are loving couples in long-term committed relationships who seek to marry in, or have their marriage recognized by, the Commonwealth of Virginia. Bostic Decl. paras. 3–5, ECF No. 26-1; London Decl. paras. 4–6, ECF No. 26-2; Schall Decl. paras. 5–7, 31, ECF No. 26-3; Townley Decl. paras. 6–19, ECF No. 26-4. They claim to suffer real and particularized injuries as a direct result of Defendants' enforcement of Virginia's Marriage Laws, including far-reaching legal and social consequences, and the pain of humiliation, stigma, and emotional distress that accumulates daily.

Plaintiffs Bostic and London plainly did submit an application for a marriage license. They tried to obtain a marriage license, and these efforts were unsuccessful. Br. Supp. Def. Schaefer's Mot. Summ. J. 2, ECF No. 41; Bostic Decl. paras. 6–10, ECF No. 26-1; London Decl. paras. 7–10, ECF No. 26-2. This establishes an Article III injury. *See Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) (holding that courts have "consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III

injury"). This Court accepts oral argument from counsel for Defendant Schaefer as a concession on this point. Tr. 32:16–20, Feb. 4, 2014, ECF No. 132 ("[U]nder Virginia's existing laws, . . . George Schaefer's office could not issue that marriage license . . . . I do believe he probably is a proper party for that reason.").

The standing challenges against Plaintiffs Schall and Townley also must fail. In Virginia, currently all marriages between opposite-sex couples that have been solemnized outside of the Commonwealth are recognized as valid in the Commonwealth as long as the parties met the legal requirements for marriage in the foreign jurisdiction. Even the status of "common law marriage," while prohibited in Virginia, is nevertheless accepted by the Commonwealth if the marriage was valid in the state in which it occurred.[6]

Plaintiffs Schall and Townley allege stigma and humiliation as a result of the enforcement of Virginia Code § 20-45.3. *See* Am. Compl. para. 34, ECF No. 18. Stigmatic injury is sometimes sufficient to support standing. *See Allen v. Wright*, 468 U.S. 737, 755 (1984) (finding that "stigmatizing injury often caused by racial discrimination" is a type of "noneconomic injury" that is "sufficient in some circumstances to support standing"). A plaintiff must first identify a "concrete interest with respect to which [he or she is] personally subject to discriminatory treatment," and "[t]hat interest must independently satisfy the causation requirement of [the] standing doctrine." *Id.* at 757 n.22; *see also Lebron v. Rumsfeld*, 670 F.3d 540, 562 (4th Cir. 2012) (explaining that Article III standing based on ongoing stigma requires that a plaintiff establish the suffering of harm).

Plaintiffs Schall and Townley satisfy the first requirement predicating standing on stigmatic injuries. Virginia Code § 20-45.3 prohibits the recognition of their valid California

---

[6] *Marriage Requirements*, Virginia Department of Health, http://www.vdh.state.va.us/vital_records/marry.htm (last visited Feb. 13, 2014); *see also Marriage in Virginia*, Virginia State Bar: An Agency of the Supreme Court of Virginia, http://www.vsb.org/site/publications/marriage-in-virginia (last visited Feb. 13, 2014).

marriage. Similarly married opposite-sex individuals do not suffer this deprivation. Plaintiffs Schall and Townley suffer humiliation and discriminatory treatment on the basis of their sexual orientation. This stigmatic harm flows directly from current state law. *See Bishop v. United States ex rel. Holder*, 04-CV-848-TCK-TLW, 2014 WL 116013, at *9 (N.D. Okla. Jan. 14, 2014).

The claims of Plaintiffs Schall and Townley also satisfy the causation element required for standing. A plaintiff must establish a sufficient connection between the state official sued and the alleged injury. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001); *see also Bishop v. Oklahoma*, 333 F. App'x 361, 365 (10th Cir. 2009) (holding that the duties of the Oklahoma Governor or the Oklahoma Attorney General were insufficiently connected to the challenged Oklahoma laws). Defendant Schaefer is a proper defendant here because he is a city official responsible for issuing and denying marriage licenses and recording marriages. Va. Code §§ 20-14, 20-33, 32.1-267(B) (2014). Defendant Rainey is a proper defendant because she is a city official responsible for providing forms for marriage certificates. An injunction prohibiting Defendants from enforcing Virginia's Marriage Laws will allow Plaintiffs Bostic and London to obtain a marriage license in the Commonwealth, and will allow the valid marriage between Plaintiffs Schall and Townley to be recognized in the Commonwealth of Virginia.

Intervenor-Defendant McQuigg, after adopting Defendant Rainey's former arguments, asserts that Plaintiffs lack standing because gay and lesbian individuals would be prohibited from marrying even in wake of a judicial invalidation of Article I, Section 15-A of the Virginia Constitution and Virginia Code Sections 20-45.2 and 20-45.3. Plaintiffs seek relief not only from these provisions, however, but also from "any other Virginia law that bars same-sex

marriage or prohibits the State's recognition of otherwise-lawful same-sex marriages from other jurisdictions." Am. Compl., Prayer for Relief, paras. 1–2, ECF No. 18.  If this Court issues the injunction sought by Plaintiffs, their injuries will be redressed.  They will be allowed to marry, or have their marriage recognized, in Virginia.  Challenges to Plaintiffs' standing are overruled.

### 2. Doctrinal developments

The next preliminary challenge pertains to determining the appropriate impact of a specific summary disposition by the United States Supreme Court.  Summary dispositions by that Court, as well as dismissals "for want of a substantial federal question," must be construed as rejecting "the specific challenges presented in the statement of jurisdiction," and leaving "undisturbed the judgment appealed from." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (these dispositions "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions").

In 1972, the Supreme Court summarily dismissed an appeal from a decision of the Supreme Court of Minnesota, which had held that 1) although a Minnesota statute defining marriage did not prohibit same-sex marriages explicitly, neither did that statute provide any authority for such marriages, and 2) the statute did not violate the Fourteenth Amendment to the United States Constitution. *Baker v. Nelson*, 191 N.W.2d 185, 185, 187 (Minn. 1971), *appeal dismissed* 409 U.S. 810 (1972).  The dismissal by the Supreme Court read, "The appeal is dismissed for want of a substantial federal question." *Baker*, 409 U.S. at 810.  Defendants here contend that because the Supreme Court found a substantial federal question lacking in *Baker*, this Court is precluded from exercising jurisdiction.

There is no dispute that such summary dispositions are considered precedential and binding on lower courts.  There is also no dispute asserted that questions presented in *Baker* are

similar to the questions presented here.  Both cases involve challenges to the constitutionality of a state statute which prohibits same-sex marriage.  Both challenges assert principles of due process and equal protection.  The ruling of the Supreme Court of Minnesota rejected arguments largely similar to those presented by Plaintiffs.  *See Baker*, 191 N.W.2d at 187 ("The equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry.").  However, summary dispositions may lose their precedential value.  They are no longer binding "when doctrinal developments indicate otherwise."  *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (quoting *Port Auth. Bondholder's Protective Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 263 n.3 (2d Cir. 1967)) (internal quotation marks omitted).

This Court concludes that doctrinal developments since 1971 compel the conclusion that *Baker* is no longer binding.  The Second Circuit recognized this explicitly, holding that "[e]ven if *Baker* might have had resonance . . . in 1971, it does not today."  *Windsor v. United States*, 699 F.3d 169, 178 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (holding that *Baker* did not foreclose jurisdiction over review of the federal Defense of Marriage Act ("DOMA")).  In so holding, the Second Circuit relied upon doctrinal developments from Supreme Court decisions, including cases creating the term "intermediate scrutiny" in *Craig v. Boren*, 429 U.S. 190, 218 (1976) (Rehnquist, J., dissenting); discussing classifications based on sex and illegitimacy in *Lalli v. Lalli*, 439 U.S. 259, 264–65 (1978); and finding no rational basis for "a classification of [homosexuals] undertaken for its own sake" in *Romer v. Evans*, 517 U.S. 620, 635 (1996). *Windsor*, 699 F.3d at 178–79.

More recently, the District Court for the District of Utah concluded that after considering the significant doctrinal developments in equal protection and due process jurisprudence, the

Supreme Court's summary dismissal in *Baker* "has little if any precedential effect today." *Kitchen v. Herbert*, No. 2:13-CV-217, 2013 WL 6697874, at *8 (D. Utah Dec. 20, 2013); *see also McGee v. Cole*, Civil Action No. 3:13-24068, 2014 WL 321122, at *9–10 (S.D.W. Va. Jan. 29, 2014) (holding that the reasoning in these cases is persuasive and rejecting *Baker* as no longer binding).

This Court concludes that doctrinal developments in the question of who among our citizens are permitted to exercise the right to marry have foreclosed the previously precedential nature of the summary dismissal in *Baker*.[7] The *Baker* summary dismissal is no longer binding.

## B. PLAINTIFFS' CONSTITUTIONAL CHALLENGES TO VIRGINIA'S MARRIAGE LAWS

Having resolved the preliminary challenges advanced against Plaintiffs' claims, the Court now turns to the more substantive questions presented by the parties. This Court must determine whether Virginia's Marriage Laws violate Plaintiffs' rights guaranteed to them under the Fourteenth Amendment of the United States Constitution. This Amendment provides: "No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Plaintiffs' due process claims are addressed first. Next, the examination turns to whether Virginia's Marriage Laws violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. Finally, the Court resolves whether Plaintiffs' claims brought under 42

---

[7] Some federal courts have ruled that *Baker* remains binding. *See Massachusetts v. HHS*, 682 F.3d 1, 8 (1st Cir. 2012); *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1002–03 (D. Nev. 2012); *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1304–05 (M.D. Fla. 2005). This Court respectfully disagrees and cites with approval the thorough reasoning on the issue in *Windsor*, *Kitchen*, and *Bishop*.

U.S.C. § 1983 have merit, and whether the Court should stay this ruling pending further guidance from the Supreme Court.

  1. Plaintiffs' rights under the Due Process Clause

The Due Process Clause of the Fourteenth Amendment applies to "matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal constitution from invasion by the States." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846–47 (1992) (quoting *Whitney v. California*, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring)) (internal quotation marks omitted). Accordingly, the initial question is whether Plaintiffs are seeking protection for a fundamental right. The second question is whether Virginia's Marriage Laws properly or improperly compromise Plaintiffs' rights.

      *a.*     *Marriage is a fundamental right*

There can be no serious doubt that in America the right to marry is a rigorously protected fundamental right. The Supreme Court has recognized repeatedly that marriage is a fundamental right protected by both the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971)) (finding that choices about marriage "are among associational rights this Court has ranked as 'of basic importance in our society[.]'"); *Casey*, 505 U.S. at 848 (finding marriage "to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause"); *Turner v. Safley*, 482 U.S. 78, 97 (1987) (finding that a regulation that prohibited inmates from marrying without the permission of the warden impermissibly burdened their right to marry); *Zablocki v. Redhail*, 434 U.S. 374, 383–84 (1978) (defining marriage as a right of liberty); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684–85

(1977) (finding that the right to privacy includes personal decisions relating to marriage); *United States v. Kras*, 409 U.S. 434, 446 (1973) (concluding that the Court "has come to regard [marriage] as fundamental"); *Boddie*, 401 U.S. at 376 (defining marriage as a "basic importance in our society"); *Loving*, 388 U.S. at 12 (finding prohibition on interracial marriage unconstitutional); *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (defining marriage as a right of privacy and a "coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred"); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (finding marriage to be a "basic civil right[] of man"); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (finding that marriage is a liberty protected by the Fourteenth Amendment); *Andrews v. Andrews*, 188 U.S. 14, 30 (1903) (quoting *Maynard v. Hill*, 125 U.S. 190, 205 (1888)) (internal quotation marks omitted) (finding marriage to be "most important relation in life"), *abrogated on other grounds, Sherrer v. Sherrer*, 334 U.S. 343, 352 (1948); *Maynard*, 125 U.S. at 205 (same).

Marriage rights are "'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B.*, 519 U.S. at 116 (quoting *Boddie*, 401 U.S. at 376) (citations omitted).

The right to marry is inseparable from our rights to privacy and intimate association. In rejecting a Connecticut law prohibiting the use of contraceptives, the Court wrote of marriage's noble purposes:

> We deal with a right of privacy older than the Bill of Rights – older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

*Griswold*, 381 U.S. at 486.

The parties before this Court appreciate the sacred principles embodied in our fundamental right to marry. Each party cherishes the commitment demonstrated in the celebration of marriage; each party embraces the Supreme Court's characterization of marriage as "the most important relation in life" and "the foundation of the family and society, without which there would be neither civilization nor progress." *Maynard*, 125 U.S. at 205, 211. Regrettably, the Proponents and the Opponents of Virginia's Marriage Laws part ways despite this shared reverence for marriage. They part over a dispute regarding who among Virginia's citizenry may exercise the fundamental right to marry.

> *b.     The Plaintiffs seek to exercise a fundamental right*

Just as there can be no question that marriage is a fundamental right, there is also no dispute that under Virginia's Marriage Laws, Plaintiffs and Virginia citizens similar to Plaintiffs are deprived of that right to marry. The Proponents' insistence that Plaintiffs have embarked upon a quest to create and exercise a new (and some suggest threatening) right must be considered, but, ultimately, put aside.

The reality that marriage rights in states across the country have begun to be extended to more individuals fails to transform such a fundamental right into some "new" creation.[8] Plaintiffs ask for nothing more than to exercise a right that is enjoyed by the vast majority of Virginia's adult citizens. They seek "simply the same right that is currently enjoyed by heterosexual individuals: the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and

---

[8] Nor should this doctrinal development be construed as any dilution of the sanctity of marriage. Similar fears were voiced and ultimately quieted after Virginia unsuccessfully defended its anti-miscegenation laws by referring to a need "'to preserve the racial integrity of its citizens,' and to prevent 'the corruption of blood,' 'a mongrel breed of citizens,' and 'the obliteration of racial pride'. . . ." *Loving*, 388 U.S. at 7 (quoting *Naim v. Naim*, 87 S.E.2d 749, 756 (Va. 1955)).

sustaining emotional bond." *Kitchen*, 2013 WL 6697874 at *16. "This right is deeply rooted in

the nation's history and implicit in the concept of ordered liberty because it protects an

individual's ability to make deeply personal choices about love and family free from government

interference." *Id.*

Virginia's Marriage Laws impose a condition on this exercise. These laws limit the

fundamental right to marry to only those Virginia citizens willing to choose a member of the

opposite gender for a spouse. These laws interject profound government interference into one of

the most personal choices a person makes. Such interference compels careful judicial

examination:

> Our law affords constitutional protection to personal decisions relating to
> marriage, procreation, contraception, family relationships, child rearing, and
> education. Our cases recognize the right of the *individual*, married or single, to be
> free from unwarranted governmental intrusion into matters so fundamentally
> affecting a person as the decision whether to bear or beget a child. Our
> precedents have respected the private realm of family life which the state cannot
> enter. These matters, involving the most intimate and personal choices a person
> may make in a lifetime, choices central to personal dignity and autonomy, are
> central to the liberty protected by the Fourteenth Amendment. *At the heart of
> liberty is the right to define one's own concept of existence, of meaning, of the
> universe, and of the mystery of human life. Beliefs about these matters could not
> define the attributes of personhood were they formed under compulsion of the
> State.*

*Casey*, 505 U.S. at 851 (1992) (second emphasis added) (quoting *Eisenstadt v. Baird*, 405 U.S.

438, 453 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1994)) (internal quotation marks

and citations omitted); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984) (our federal

Constitution "undoubtedly imposes constraints on the State's power to control the selection of

one's spouse").

Gay and lesbian individuals share the same capacity as heterosexual individuals to form,

preserve and celebrate loving, intimate and lasting relationships. Such relationships are created

through the exercise of sacred, personal choices—choices, like the choices made by every other citizen, that must be free from unwarranted government interference.

     *c.*    *Virginia's Marriage Laws are subject to strict scrutiny*

In general, state regulations are presumed valid, and are upheld, when the regulations are rationally related to a legitimate state interest. *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997).

However, strict scrutiny is imposed as substantive due process protection to "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720–21 (quoting *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503 (1977) (plurality opinion); *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)) (internal quotation marks and citations omitted).

Under strict scrutiny, the regulations pass constitutional muster only if they are narrowly tailored to serve a compelling state interest. *Id.* at 721; *see also Zablocki*, 434 U.S. at 388 (striking down a requirement that non-custodial parents paying child support seek court approval before marrying); *Boddie*, 401 U.S. at 380–81 (holding that a divorce could not be denied to an indigent person who was unable to afford the filing fees).

Because marriage is a fundamental right, therefore, Virginia's Marriage Laws cannot be upheld unless they are justified by "compelling state interests" and are "narrowly drawn to express only those interests." *Carey*, 431 U.S. at 686; *accord Zablocki*, 434 U.S. at 388 ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.").

The Court turns to the three primary justifications the Proponents proffer in support of Virginia's Marriage Laws and their significant interference with Plaintiffs' freedom to exercise their fundamental right to marry: (1) tradition; (2) federalism; and (3) "responsible procreation" and "optimal child rearing."

### d. Tradition

Virginia has traditionally limited marriages to opposite-sex relationships. The Proponents assert that preserving and perpetuating this tradition is a state interest that is sufficiently important to justify the impact of Virginia's Marriage Laws on Plaintiffs and other citizens in Virginia who are lesbian and gay.[9]

Proponents suggest that these state interests in tradition arise from a legitimate desire to discourage individuals from abusing marriage rights by marrying for the sole purpose of qualifying for benefits for which they would otherwise not qualify. Tr. 45:14–19, ECF No. 132. The "[a]ncient lineage of a legal concept does not give it immunity from attack for lacking a rational basis." *Heller v. Doe*, 509 U.S. 312, 326 (1993). This proffer lacks any rational basis. Virginia's purported interest in minimizing marriage fraud is in no way furthered by excluding one segment of the Commonwealth's population from the right to marry based upon that segment's sexual orientation.

---

[9] At oral argument, counsel for Intervenor-Defendant McQuigg contended that "[m]arriage is not constitutional because it's ancient. It's ancient because it is rational and it [has] animated the laws in this country and in this Commonwealth since the very beginning." Tr. 52:1–4, ECF No. 132. While no one disputes that some persons have enjoyed the right and privilege to marry since ancient times, beliefs based on ancient roots that this exercise should properly remain limited to one portion of our population, however dearly held, contribute little to the judicial endeavor of evaluating whether the purported state interests in such timelines are sufficiently important to rationalize the impact of the Marriage Laws under current scrutiny. Other profound infringements upon our citizens' rights have been explained as a consequence of heritage, and those explanations have been found wanting. Interracial marriage "was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving v. Virginia.*" *Casey*, 505 U.S. at 847–48; *see also Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 992 (N.D. Cal. 2010) (recognizing that the Supreme Court rejected race restrictions despite their historical prevalence because the restrictions "stood in stark contrast to the concepts of liberty and choice inherent the right to marry").

Judicial evaluation of the importance of tradition as a state rationale for infringing upon Plaintiffs' rights must draw a focus on the history of the laws that are under scrutiny. Virginia's Affirmation of Marriage Act, known as House Bill 751, was drafted in response to fears that "homosexual marriage or same sex unions [are] . . . directed at weakening the institution of marriage," and that "defining marriage or civil unions as permissible for same sex individuals as simply an alternate form of 'marriage' [would] radically transform the institution of marriage with serious and harmful consequences to the social order." Affirmation of Marriage Act, H.B. 751 (2004) (enacted).

Concerns that schools might be compelled "to teach that 'civil unions' or 'homosexual marriage'" should be "equivalent to traditional marriage" and that "churches whose teachings [do] not accept homosexual behavior as moral will lose their tax exempt status," fueled the proposed legislation.  *Id.*  The promotion of "tradition" was evident in the Bill's language regarding the "profound moral and legal difference between private behavior conducted outside the sanction . . . of the law . . . and granting such behavior a legal institutional status in society." *Id.* This "radical change" would trigger "unforeseen legal and social consequences," and the provision of "same sex unions would obscure certain basic moral values and further devalue the institution of marriage and the status of children." *Id.*

The inescapable conclusion regarding the Commonwealth's interest in tradition is that an adherence to a historical definition of traditional marriage is desired to avoid "radical changes" that would result in the diminishing one common, long-held view of what marriage means. The Supreme Court has rejected the assertion that a prevailing moral conviction can, alone, justify upholding a constitutionally infirm law: "'the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a

law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack.'" *Lawrence v. Texas*, 539 U.S. 558, 577–78 (2003) (alteration provided) (quoting *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting)) (holding that a Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct was unconstitutional, as applied to adults engaging in consensual acts in the privacy of a home); *see also Kitchen*, 2013 WL 6697874, at *27 ("[T]radition alone cannot form a rational basis for a law."). Our courts are duty-bound to define and protect "the liberty of all, not to mandate our own moral code." *Lawrence*, 539 U.S. at 571 (quoting *Casey*, 505 U.S. at 850).

Nearly identical concerns about the significance of tradition were presented to, and resolved by, the Supreme Court in its *Loving* decision. The *Loving* Court struck down Virginia's ban on interracial marriage despite the ban's existence since "the colonial period." 388 U.S. at 6. Notwithstanding the undeniable value found in cherishing the heritages of our families, and many aspects of the heritages of our country and communities, the protections created for us by the drafters of our Constitution were designed to evolve and adapt to the progress of our citizenry. The Supreme Court recognized this eloquently:

> It is . . . tempting . . . to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference . . . when the Fourteenth Amendment was ratified. But such a view would be inconsistent with our law.

*Casey*, 505 U.S. at 847 (citation omitted).

Tradition is revered in the Commonwealth, and often rightly so. However, tradition alone cannot justify denying same-sex couples the right to marry any more than it could justify Virginia's ban on interracial marriage.

e.    *The appropriate balance regarding federalism*

The Proponents also assert that Virginia maintains a significant interest in reserving the power to regulate essential state matters, and to shield the exercise of that power from intrusive, improper federal interference.    The Supreme Court recently addressed the long-standing deference our federal government pays to state-law policy decisions with respect to domestic relations:

> State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, *see, e.g., Loving*, 388 U.S. 1 (1967); but, subject to those guarantees, "regulation of domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States." *Sosna v. Iowa*, 419 U.S. 393, 404 (1975).
>
> The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens. *See Williams v. North Carolina*, 317 U.S. 287, 298 (1942) ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders"). The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the "[p]rotection of offspring, property interests, and the enforcement of marital responsibilities." *Ibid.* "[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . [and] the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce." *Haddock v. Haddock*, 201 U.S. 562, 575 (1906); *see also In re Burrus*, 136 U.S. 86, 593–94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States").

*Windsor*, 133 S. Ct. at 2691 (alterations and omission in original).[10]

This Court remains mindful that the federal intervention is best exercised rarely, and that the powers regarding domestic relations properly rest with the good offices of state and local government.  This deference is appropriate, and even essential.  However, federal courts have intervened, properly, when state regulations have infringed upon the right to marry.  The

---

[10] In *Windsor* the Supreme Court struck down Section 3 of DOMA because it violated the due process and equal protection principles of the Fifth Amendment by denying federal recognition of a marriage lawfully entered into in another jurisdiction.  133 S. Ct. at 2693.  The Court ruled that DOMA improperly instructed "all federal officials, and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others." *Id.* at 2696.

*Windsor* Court prefaced its analysis about deference to the state laws defining and regulating marriage by citing *Loving*'s holding that recognized that "of course," such laws "must respect the constitutional rights of persons." *Id.* In signaling that due process and equal protection guarantees must trump objections to federal intervention, *Windsor*'s "citation to *Loving* is a disclaimer of enormous proportion." *Bishop*, 2014 WL 116013, at *18.

Similarly, in *Zablocki*, the Court upheld the right of prison inmates to marry, while acknowledging domestic relations "as an area that has long been regarded as a virtually exclusive province of the States." 434 U.S. at 398–99 (Powell, J., concurring) (quoting *Sosna*, 419 U.S. at 404) (internal quotation marks omitted).

In *Windsor*, our Constitution was invoked to protect the individual rights of gay and lesbian citizens, and the propriety of such protection led to upholding state law against conflicting federal law. The propriety of invoking such protection remains compelling when faced with the task of evaluating the constitutionality of *state* laws. This propriety is described eloquently in a dissenting opinion authored by the Honorable Antonin Scalia:

> As I have said, the real rationale of [the *Windsor* opinion] is that DOMA is motivated by "bare . . . desire to harm" couples in same-sex marriages. How easy it is, indeed how inevitable, to reach the same conclusion with regard to state laws denying same-sex couples marital status.

*Windsor*, 133 S. Ct. at 2709 (Scalia, J., dissenting) (alteration provided) (omission in original) (quoting *Windsor*, 133 S. Ct. at 2691) (citations and some internal quotation marks omitted); *see also Kitchen*, 2013 WL 6697874 at *7 (agreeing with this analysis).

The Proponents' related contention that judicial intervention should be suspended in deference to the possibility that the Virginia legislature and Virginia's electorate might resolve Plaintiffs' claims also lacks merit. The proposal disregards the gravity of the ongoing significant harm being inflicted upon Virginia's gay and lesbian citizens. Moreover, the proposal ignores

28

the needless accumulation of that pain upon these citizens, and the stigma, humiliation and prejudice that would be visited upon these citizens' children, as they continue to wait for this possibility to become realized.[11]

When core civil rights are at stake the judiciary must act. As the Supreme Court said in *West Virginia State Board of Education v. Barnette*:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

319 U.S. 624, 638 (1943). Accordingly, this Court must perform its constitutional duty in deciding the issues currently presented before it. Notwithstanding the wisdom usually residing within proper deference to state authorities regarding domestic relations, judicial vigilance is a steady beacon searching for an ever-more perfect justice and truer freedoms for our country's citizens. Intervention under the circumstances presented here is warranted, and compelled.

    *f.*    *The "for-the-children" rationale*

The Proponents of Virginia's Marriage Laws contend that "responsible procreation" and "optimal child rearing" are legitimate interests that support the Commonwealth's efforts to prohibit some individuals from marrying. Counsel for Intervenor-Defendant asserted at oral argument that marriage is about children. Tr. 49:20–22, ECF No. 132. He asserted that the Commonwealth has a legitimate interest in "trying to tie those children as best it can or encourage without being coercive those children to enter into a union with a loving mom and

---

[11] In Virginia, this proposal would require majorities in both chambers of the General Assembly to vote, in two separate legislative years, before and after a general election of the members of the House of Delegates, to repeal Virginia's constitutional amendment banning same-sex marriage, as well as a subsequent majority vote by the electorate at a general election. Va. Const. art. XII, § 1.

dad, specifically the mom and dad [who] are responsible for bringing them into this world." *Id.* at 59:20–24. This counsel also argued that the Commonwealth has a legitimate interest in celebrating the "diversity of the sexes," but failed to establish how prohibiting some Virginia citizens from marrying is related rationally to such a celebration. *Id.* at 52:9–10.

In sum, Proponents contend that Virginia should be permitted to "rationally conclude that, all things being equal, it is better for the natural parents to also be the legal parents." Br. Supp. Def. Rainey's Mot. Summ. J. 23, ECF No. 39.

The *Amici* Professors refer to evidence that purports to demonstrate that children benefit from the unique parenting contributions of opposite-sex parents. The *Amici* Professors reject recent studies that found that children raised by gay and lesbian parents are no different from children raised by "intact biological parents," asserting that the studies are empirically undermined by methodological limitations.

This rationale fails under the applicable strict scrutiny test as well as a rational-basis review. Of course the welfare of our children is a legitimate state interest. However, limiting marriage to opposite-sex couples fails to further this interest. Instead, needlessly stigmatizing and humiliating children who are being raised by the loving couples targeted by Virginia's Marriage Laws betrays that interest. E. S.-T., like the thousands of children being raised by same-sex couples, is needlessly deprived of the protection, the stability, the recognition and the legitimacy that marriage conveys.

"Like opposite-sex couples, same-sex couples have happy, satisfying relationships and form deep emotional bonds and strong commitments to their partners." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 967 (N.D. Cal. 2010). Gay and lesbian couples are as capable as other couples of raising well-adjusted children. *See id.* at 980 ("Children raised by

gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted"). In the field of developmental psychology, "the research supporting this conclusion is accepted beyond serious debate." *Id.*[12]

Additionally, the purported "for-the-children" rationale fails to justify Virginia's ban on same-sex marriage because recognizing a gay individual's fundamental right to marry can in no way influence whether other individuals will marry, or how other individuals will raise families. "Marriage is incentivized for naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included." *Bishop*, 2014 WL 116013, at *29. As was recognized in *Kitchen*:

> [I]t defies reason to conclude that allowing same-sex couples to marry will diminish the example that married opposite-sex couples set for their unmarried counterparts. Both opposite-sex and same-sex couples model the formation of committed, exclusive relationships, and both establish families based on mutual love and support.

2013 WL 6697874, at *25.

Counsel for Intervenor-Defendant McQuigg proclaimed at oral argument that "[P]laintiffs are asking this court to . . . strike down the marriage laws that have existed now for 400 years . . . and make a policy in this state that mothers and fathers [do not] matter." Tr. at 53:5–8, ECF No. 132. This is a profound distortion of what Plaintiffs seek. Plaintiffs honor, and yearn for, the sacred values and dignity that other individuals celebrate when they enter into marital vows in Virginia, and they ask to no longer be deprived of the opportunity to share these fundamental rights.

---

[12] *See, e.g.*, Brief for *Amici* The Am. Psychological Ass'n, et al. at 18-26, *Windsor v. United States*, 133 S. Ct. 2675 (2013) (No. 12-307); Brief for *Amici* The Am. Psychological Ass'n, et al. at 22–30, *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) (No. 12-144); Brief for *Amicus* The Am. Sociological Ass'n at 6–14, *Windsor v. United States*, 133 S. Ct. 2675 (2013) (No. 12-307); Brief for *Amicus* The Am. Sociological Ass'n at 6–14, *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) (No. 12-144). This Court notes that the *Amici* Professors in this case did not refute this research, but represented only that more research would be beneficial.

The "for-the-children" rationale also fails because it would threaten the legitimacy of marriages involving post-menopausal women, infertile individuals, and individuals who choose to refrain from procreating. *See Bishop*, 2014 WL 116013, at *30.

The "for-the-children" rationale rests upon an unconstitutional, hurtful and unfounded presumption that same-sex couples cannot be good parents. Forty years ago a similarly unfortunate presumption was proffered to defend a law in Illinois that removed children from the custody of unwed fathers upon the death of the mother. *Stanley v. Illinois*, 405 U.S. 645, 653 (1972). Proponents of the law asserted "that Stanley and all other unmarried fathers can *reasonably be presumed to be unqualified* to raise their children." *Id.* (emphasis added). The Supreme Court said that such a startling presumption "cannot stand." *Id.* at 657. The *Stanley* Court's holding has been construed to mean "that the State could not conclusively presume that any particular unmarried father was unfit to raise his child; the Due Process Clause required a more individualized determination." *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 645 (1974) (discussing the holding in *Stanley v. Illinois*).

"[T]he demographic changes of the past century make it difficult to speak of an average American family." *Troxel v. Granville*, 530 U.S. 57, 63 (2000). Attempting to legislate a state-sanctioned preference for one model of parenting that uses two adults over another model of parenting that uses two adults is constitutionally infirm. "The composition of families varies greatly from household to household," *id.*, and there exist successful, well-adjusted children from all backgrounds. "Certainly same-sex couples, like other parenting structures, can make quality and successful efforts in raising children. That is not in question." *Amici* Profs.' Br. Supp. Defs.' Mots. Summ. J. 11, ECF No. 64-1.

This Court endorses the portion of the oral argument from counsel for Intervenor-Defendant in which he acknowledged that "marriage exists to provide structure and stability for the benefit of the child, giving them every opportunity possible to know, to be loved by and raised by a mom and dad who are responsible for their existence." Tr. 59:6–10, ECF No. 132. Same-sex couples can be just as responsible for a child's existence as the countless couples across the nation who choose, or are compelled to rely upon, enhanced or alternative reproduction methods for procreation.[13]

Finally, the "for-the-children" rationale misconstrues the dignity and values inherent in the fundamental right to marry as primarily a vehicle for "responsibly" breeding "natural" offspring.[14] Such misconstruction ignores that the profound non-procreative elements of marriage, including "expressions of emotional support and public commitment," "spiritual significance," and "expression of personal dedication." *Turner*, 482 U.S. at 95–96. In recognizing that prison inmates have the right to wed notwithstanding that incarceration may prevent them from consummating the marriage, the *Turner* Court heralded the legal, economic, and social benefits of marriage, teaching that "marital status often is a precondition to the receipt of government benefits . . . , property rights . . ., and other, less tangible benefits." *Id.* at 96.

In sum, the "for-the-children" rationale fails to justify denying an individual the benefits and dignity and value of celebrating marriage simply because of the gender of the person whom that individual loves. The state's compelling interests in protecting and supporting our children are not furthered by a prohibition against same-sex marriage.

---

[13] Even assuming as true, for argument's sake, the notion that *some* same-sex couples might be worse parents than some opposite-sex couples, "[a] law which condemns, without hearing, *all* the individuals of a class to so harsh a measure as the present because some or even many merit condemnation, is lacking in the first principles of due process." *Skinner*, 316 U.S. at 545 (emphasis added).

[14] Intervenor-Defendant asserted at oral argument that "but for children there would be no need of any institution concerned with sex." Tr. at 50:8–9, ECF No. 132. But the Supreme Court has already held that "it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse." *Lawrence*, 539 U.S. at 567.

2. Plaintiffs' Rights under the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of its laws." U.S. Const. amend. XIV, § 1. Just as the analysis regarding the claims involving substantive due process began, the evaluation of whether certain legislation violates the Equal Protection Clause commences with determining whether the challenged law interferes significantly with a fundamental right. If so, the legislation "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388. For the reasons provided above, this Court concludes that Virginia's Marriage Laws significantly interfere with a fundamental right, and are inadequately tailored to effectuate only those interests. Therefore, the laws are unconstitutional under the Equal Protection Clause as well.

However, even without a finding that a fundamental right is implicated, the Marriage Laws fail under this Clause. The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The Clause places no limitation on a state's power to treat dissimilar people differently. *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995) ("[It] does not mean that persons in different circumstances cannot be treated differently under the law.").

These constitutional protections are invoked instead when a state statute treats persons who are standing in the same relation to the statute in a different manner, either on its face or in practice. Individuals need only be similarly situated for the purposes of the challenged law. *Id.*

("It requires that the states apply each law, within its scope, equally to persons similarly situated, and that any differences of application must be justified by the law's purpose.").

The parties do not dispute that same-sex couples may be similarly situated to opposite-sex couples with respect to their love and commitment to one another. However, the Proponents contend that the Commonwealth's primary purpose for recognizing and regulating marriage is responsible procreation and child-rearing. By construing the definition of these activities to refer to the capacity of a married couple to naturally produce children, the Proponents assert that same-sex couples must be viewed as fundamentally different from heterosexual couples.

This recent embrace of "natural" procreation as the primary inspiration and purpose for Virginia's Marriage Laws is inconsistent with prior rationalizations for the laws. This purpose was effectively disavowed by the legislation itself, which declared that marriage should be limited to opposite-sex couples "whether or not they are reproductive in effect or motivation." Affirmation of Marriage Act, HB 751 (2004) (enacted).

A more just evaluation of the scope of Virginia's Marriage Laws at issue establishes that these laws impact Virginia's adult citizens who are in loving and committed relationships and want to be married under the laws of Virginia. The laws at issue target a subset (gay and lesbian individuals) who are similarly situated to Virginia's heterosexual individuals, and deprive that subset of the opportunity to marry. Even assuming (but not deciding) that the Marriage Laws do not significantly interfere with the fundamental rights of the class created by the laws (gay and lesbian individuals), this Court must nevertheless determine how closely to scrutinize the challenged regulation.

Deference to Virginia's judgment on this question is unwarranted, because there are reasonable grounds to suspect "prejudice against discrete and insular minorities . . . which tends

seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities[.]" *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

Although the parties disagree[15] on the extent of animus that has been directed toward gay and lesbian people, "for centuries there have been powerful voices to condemn homosexual conduct as immoral." *Lawrence*, 539 U.S. at 571.

This moral condemnation continues to manifest in Virginia in state-sanctioned activities. The Virginia legislature has passed a law permitting adoption agencies to refuse adoptions based on the sexual orientation of the prospective parents. *See* Va. Code § 63.2-1709.3 (2014). Virginia's former Attorney General directed colleges and universities in the Commonwealth to eliminate protections that had been in place regarding "'sexual orientation,' 'gender identity,' 'gender expression,' or like classification" from the institutions' non-discrimination policies. Lustig Decl. Ex. J, at 1, ECF No. 26-15. This record alone gives rise to suspicions of prejudice sufficient to decline to defer to the state on this matter.

It is well-settled that the Supreme Court has developed levels of scrutiny for purposes of deciding whether a state law discriminates impermissibly against members of a class in violation of the Equal Protection Clause, depending upon the kind of class affected. The greatest level of scrutiny is reserved for race or national origin classifications. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

An "intermediate" level of scrutiny has been employed by the Court as well, and is reserved for laws that employ quasi-suspect classifications such as gender, *Craig*, 429 U.S. at 197, or illegitimacy, *Mills v. Habluetzel*, 456 U.S. 91, 98–99 (1982). This intermediate level of scrutiny upholds state laws only if they are "substantially related to an important governmental objective." *Clark*, 486 U.S. at 461.

---

[15] *See* Tr. 62:10–11, ECF No. 132 ("[P]laintiffs can prove and bring forth no history of discrimination.").

The least rigorous kind of scrutiny is reserved for legislative classifications that are not "suspect." This kind of legislation passes constitutional muster if it bears a rational relationship to some legitimate end. *Romer*, 517 U.S. at 631.

Virginia's Marriage Laws fail to display a rational relationship to a legitimate purpose, and so must be viewed as constitutionally infirm under even the least onerous level of scrutiny. Accordingly, this Court need not address Plaintiffs' compelling arguments that the Laws should be subjected to heightened scrutiny.[16]

The Proponents' contentions that a rational relationship exists between Virginia's Marriage Laws at issue and a legitimate purpose have been considered carefully. These contentions have been evaluated fully under the analysis of Plaintiffs' substantive due process claims.

The legitimate purposes proffered by the Proponents for the challenged laws—to promote conformity to the traditions and heritage of a majority of Virginia's citizens, to perpetuate a generally-recognized deference to the state's will pertaining to domestic relations laws, and, finally, to endorse "responsible procreation"—share no rational link with Virginia Marriage Laws being challenged. The goal and the result of this legislation is to deprive Virginia's gay and lesbian citizens of the opportunity and right to choose to celebrate, *in marriage*, a loving, rewarding, monogamous relationship with a partner to whom they are committed for life. These results occur without furthering any legitimate state purpose.

---

[16] Although this Court need not decide whether Virginia's Marriage Laws warrant heightened scrutiny, it would be inclined to so find. *See Perry*, 704 F. Supp. 2d at 997 ("[S]trict scrutiny is the appropriate standard of review to apply to legislative classifications based on sexual orientation. All classifications based on sexual orientation appear suspect, as the evidence shows that California would rarely, if ever, have a reason to categorize individuals based on their sexual orientation."), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052, 1080–82, 1095 (9th Cir. 2012), *vacated for want of standing sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652, 2668 (2013); *SmithKline Beecham Corp. v. Abbott Labs*, Nos. 11–17357, 11–17373, 2014 WL 211807, at *9 (9th Cir. Jan. 21, 2014) (holding that *Windsor* compels heightened scrutiny of a lawyer's peremptory strike of jurors based on their sexual orientation).

3. Plaintiffs are entitled to relief under Section 1983

To state a claim for relief in an action brought under Section 1983, Plaintiffs must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). The Proponents declined to challenge Plaintiffs' Section 1983 claims. The validity of these claims warrant brief review.

"The ultimate issue in determining whether a person is subject to suit under [Section] 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982)). Plaintiffs allege that Virginia's Marriage Laws, and their enforcement by the state officials who are named defendants, violate their rights under the Equal Protection Clause of the Fourteenth Amendment. Because Virginia's Marriage Laws are herein struck as unconstitutional, and there is sufficient state action to permit relief under the Federal Due Process and Equal Protection Clauses, Plaintiffs' Section 1983 claims are well-taken.

## IV.  CONCLUSION

Each of the parties before the Court recognizes that marriage is a sacred social institution. The commitment two individuals enter into to love, support each other, and to possibly choose to nurture children enriches our society. Although steeped in a rich, tradition- and faith-based legacy, Virginia's Marriage Laws are an exercise of governmental power. For those who choose to marry, and for their children, Virginia's laws ensures that marriage provides profound legal, financial, and social benefits, and exacts serious legal, financial, and social obligations. The government's involvement in defining marriage, and in attaching benefits that accompany the

institution, must withstand constitutional scrutiny. Laws that fail that scrutiny must fall despite the depth and legitimacy of the laws' religious heritage.

The Court is compelled to conclude that Virginia's Marriage Laws unconstitutionally deny Virginia's gay and lesbian citizens the fundamental freedom to choose to marry. Government interests in perpetuating traditions, shielding state matters from federal interference, and favoring one model of parenting over others must yield to this country's cherished protections that ensure the exercise of the private choices of the individual citizen regarding love and family.

Ultimately, this is consistent with our nation's traditions of freedom. "[T]he history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded." *United States v. Virginia*, 518 U.S. 515, 557 (1996). Our nation's uneven but dogged journey toward truer and more meaningful freedoms for our citizens has brought us continually to a deeper understanding of the first three words in our Constitution: *we the people*. "We the People" have become a broader, more diverse family than once imagined.[17]

Justice has often been forged from fires of indignities and prejudices suffered.[18] Our triumphs that celebrate the freedom of choice are hallowed.[19] We have arrived upon another moment in history when *We the People* becomes more inclusive, and our freedom more perfect.

---

[17] *See* U.S. CONST. amend. XV (granting African American men the right to vote); U.S. CONST. amend XIX (granting women the right to vote).

[18] *See Powell v. State of Ala.*, 287 U.S. 45 (1932) (guaranteeing legal counsel in criminal proceedings in state and federal courts); *Shelley v. Kraemer*, 334 U.S. 1 (1948) (prohibiting courts from enforcing "restrictive covenants" that prevent people of a certain race from owning or occupying property); *Brown v. Board of Ed. of Topeka*, 347 U.S. 483 (1954) (allowing desegregation of schools); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (finding defendants in criminal cases have an absolute right to counsel); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) (finding that any business participating in interstate commerce would be required to follow all rules of the federal civil rights legislation); *Loving v. Virginia*, 388 U.S. 1 (1967) (finding prohibition on interracial marriage unconstitutional); *Reed v. Reed*, 404 U.S. 71 (1971) (finding for the first time that a law that discriminates against women is unconstitutional); *Frontiero v. Richardson*, 411 U.S. 677 (1973) (striking down a federal statute that automatically granted male members of the uniformed services housing and benefits for their wives, but required female members to demonstrate the "actual dependency" of their husbands to qualify for the same benefit); *Craig v. Boren*, 429 U.S. 190 (1976) (adopting a "heightened scrutiny" standard of review to evaluate legal distinctions based

Case 2:13-cv-00395-AWA-LRL   Document 135   Filed 02/13/14   Page 40 of 41 PageID# 1082

Almost one hundred and fifty four years ago, as Abraham Lincoln approached the cataclysmic rending of our nation over a struggle for other freedoms, a rending that would take his life and the lives of hundreds of thousands of others, he wrote these words: *"It can not have failed to strike you that these men ask for just . . . the same thing—fairness, and fairness only. This, so far as in my power, they, and all others, shall have."*[20]

The men and women, and the children too, whose voices join in noble harmony with Plaintiffs today, also ask for fairness, and fairness only. This, so far as it is in this Court's power, they and all others shall have.

### ORDER

The Court finds Va. Const. Art. I, § 15-A, Va. Code §§ 20-45.2, 20-45.3, and any other Virginia law that bars same-sex marriage or prohibits Virginia's recognition of lawful same-sex marriages from other jurisdictions unconstitutional. These laws deny Plaintiffs their rights to due process and equal protection guaranteed under the Fourteenth Amendment of the United States Constitution.

The Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 25), **GRANTS** Plaintiffs Motion for Preliminary Injunction (ECF No. 27) and **DENIES** Defendant Schaefer's and Intervenor-Defendant's Motions for Summary Judgment (ECF Nos. 38 and 40). The Court **ENJOINS** the Commonwealth from enforcing Sections 20-45.2 and 20-45.3 of the

---

on gender); *Dothard v. Rawlingson*, 433 U.S. 321 (1977) (invalidating Alabama's height and weight requirements for prison guards that have the effect of excluding the majority of female candidates); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) (finding affirmative action unfair if it resulted in reverse discrimination); *United States v. Virginia*, 518 U.S. 515 (1996) (ruling that the all-male Virginia Military Institute's discriminatory admissions policy violated women's equal protection rights).

[19] *See Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (implying a right to privacy in matters of contraception between married people); *Loving v. Virginia*, 388 U.S. 1 (1967) (protecting an individual's choice to marry the person he or she loves); *Roe v. Wade*, 410 U.S. 113 (1973) (finding an implied right to privacy protects a woman's choice in matters of abortion); *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990) (finding that while the Constitution protects a person's right to reject life-preserving medical treatment (their "right to die"), states can regulate that interest if the regulation is reasonable).

[20] Letter from Abraham Lincoln to the Hon. Leonard Swett (May 30, 1860), *in* 4 *The Collected Works of Abraham Lincoln* 57 (Roy P. Basler et al. eds. 1953).

Virginia Code and Article I, § 15-A of the Virginia Constitution to the extent these laws prohibit a person from marrying another person of the same gender.

In accordance with the Supreme Court's issuance of a stay in *Herbert v. Kitchen*, and consistent with the reasoning provided in *Bishop*, this Court stays execution of this injunction pending the final disposition of any appeal to the Fourth Circuit Court of Appeals.

Counsel for Plaintiffs, Defendants, and Intervenor-Defendant are ordered to file proposed Judgments for the Court's consideration.  These proposals shall be filed by March 14, 2014.

**IT IS SO ORDERED.**

Arenda L. Wright Allen
United States District Judge

February 13ᵗʰ, 2014
Norfolk, Virginia

41